682 P.2d 524

William and Gretchen HELLAR, husband and wife; Bingo Si John; and Coeur D'Alene, Idaho, a Municipal Corporation, Plaintiffs-Appellants-Cross-Respondents,

and

Samuel A. Rohrer; Douglas E. Long, Benewah County, a Political Subdivision of the State of Idaho; and Post Falls Highway District, Plaintiffs,

v.

Pete T. CENARRUSA, Secretary of the State of Idaho; Clifford Chapin, in his official capacity as Bonner County Clerk and on behalf of those similarly situated; and State of Idaho, Defendants-Respondents-Cross-Appellants,

and

John V. Evans, Governor of the State of Idaho, Appellant-Cross Respondent by Intervention.

No. 15201.

Supreme Court of Idaho.

Jan. 4, 1984.

See, also, 106 Idaho 580, 682 P.2d 539.

Raymond C. Givens and W.W. Nixon, Coeur d'Alene, for plaintiff-appellant-cross-respondent Hellar.

Jim Jones, Atty. Gen., Kenneth R. McClure, Deputy Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for defendants-respondents-cross-appellants.

Pat Costello, State of Idaho, Boise, for intervenor Governor.

HUNTLEY, Justice.

This appeal from a district court judgment ordering reapportionment of the Idaho legislature is the sequel to *Hellar v. Cenarrusa,* 104 Idaho 858, 664 P.2d 765 (1983) (Hellar I). In *Hellar I* the district court had held that the reapportionment scheme of House Bill 830 of the second session of the Forty-Fifth Legislature (codified as I.C. § 67–202) violated art. 3, § 5 of the Idaho Constitution. That section provides that a "senatorial or representative District, when more than one county shall constitute the same, shall be composed of contiguous counties, and *no county shall be divided in creating such districts."* (Emphasis added.) It has been the State's position that violation of the Idaho constitutional provision is acceptable where it is compelled by adherence to the one person/one vote mandate of the equal protection clause of the federal Constitution. We agree that if both constitutional provisions could not be accommodated, the federal would take precedence. However, in *Hellar I* we stated:

> "We uphold the district court's declaratory order that Idaho Const. Art. 3, § 5, is not necessarily invalidated by the equal protection clause of the fourteenth amendment of the United States Constitution, and the decisions of the United States Supreme Court earlier discussed herein, relating to equality of voting. The evidence produced by the plaintiffs ... presented a *prima facie* case of invalidity of H.B. 830 ...." 104 Idaho at 861, 664 P.2d at 768.

The defendants were given the opportunity, on remand, to present further evidence on the issue of the constitutionality of H.B. 830. After trial on remand the district court held that H.B. 830 is unconstitutional as violative of Idaho Const. art. 3, § 5. It has continued to be the defendants' position that the legislature cannot draft a reapportionment plan with a constitutionally permissible population deviation except by dividing counties. In the absence of a new legislative plan, the district court adopted a reapportionment plan (identified as Court Plan 14–B) which does not divide counties in contravention of the Idaho constitution and which, the court held, is not in violation of the federal constitution. The question we are faced with on appeal is (1) whether the district court erred in holding H.B. 830 unconstitutional. Plaintiffs, and defendants in their cross-appeal, have raised the additional issues of (2) whether, if it is unconstitutionally constituted, the present legislature may sit "de facto" in 1984, or whether it must be enjoined from sitting pending election of a new legislature; (3) whether defendants were denied a fair and impartial trial; and (4) whether the trial court abused its discretion in awarding attorney fees to plaintiffs below.

I

CONSTITUTIONALITY OF H.B. 830

It is undisputed that under H.B. 830 twenty-two of the thirty-five legislative dis-

tricts join all or a portion of one county with portions of one or more other counties, in contravention of art. 3, § 5. The question is whether such a plan, which impermissibly divides counties, is the only means to achieve equality of representation. We hold that it is not. The reapportionment plan adopted by the district court complies with both state and federal constitutional requirements. It establishes thirty-three districts with forty-two senate seats and eighty-four representative seats. There are six multimember districts and seven floterial districts. None of the districts divides any county in a way prohibited by the Idaho Constitution. The district court, in its factual findings, determined that "the overall range of population deviation between districts of Plan 14–B is 9.65%, with the greatest district population of 23,748 and the lowest of 21,576."

■ A population deviation of 9.65% is well within tolerable limits. The respondents argue, however, that the trial court erred in utilizing the "aggregate" method of statistical analysis to arrive at a population deviation of 9.65%, and that the proper statistical method is the "component" method, which yields a population deviation of 41.3%. The determination of the propriety of the aggregate method for determining the population deviation of Plan 14–B was a factual determination supported by competent and substantial evidence. The record reflects that a full day of trial was devoted to this issue, with experts on either side presenting arguments pro and con as to each methodology. The district court was persuaded by the fact that the United States Supreme Court has traditionally applied the aggregate formula in examining the population deviations of challenged reapportionment plans. *Boyer v. Gardner*, 540 F.Supp. 624 (D.N.H. 1982). When a question involving the relative validity of the two statistical methods was presented to the United States Supreme Court in *Mahan v. Howell*, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Court relied on the factual determination of the percentage of deviation made by the district court, stating, "we decline to enter this imbroglio

of mathematical manipulation and confine our consideration to the figures actually found by the court and used to support its holding of unconstitutionality." 410 U.S. at 319, n. 6, 93 S.Ct. at 982, n. 6. The Court went on to reverse the district court's holding of unconstitutionality based on the lower court's figure of 16.4% deviation from the ideal district. The suggested other method yielded a figure of 23.6% deviation. We find no error in the district court's finding of a figure of 9.65% population deviation for Plan 14–B in reapportioning Idaho's legislative districts.

■ Nevertheless, supposing the proper statistical method yielded a population deviation of 41.3%, given Idaho's state constitutional mandate, and its particular circumstances (geographic, economic, social and others), that percentage would still pass muster under federal constitutional standards in view of the decisions of the United States Supreme Court.

■ In *Brown v. Thompson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983), the United States Supreme Court approved a population deviation as high as 89% as to one county in the state of Wyoming. At issue was whether "Wyoming's policy of preserving county boundaries" justified the unusual deviation as to that county. Of importance to the Court in its decision was the fact that Wyoming's population deviation resulted from "Wyoming's longstanding and legitimate policy of preserving county boundaries." 462 U.S. at ——, 103 S.Ct. at 2698. It did not result from application of discriminatory or arbitrary methods or purposes for reapportioning. Here, as in *Brown*, the population deviations result from consistent and neutral application of a legitimate policy of preserving county boundaries. Idaho's policy is grounded in its Constitution. The district court found "that Idaho has followed a state policy of preserving county boundaries as manifested by Art. 3, Sec. 5 of the Idaho Constitution." The court set out a detailed list of facts in support of its finding (attached to this opinion as Appendix A). Accordingly,

we reject respondents' argument that a plan cannot be devised which complies with both the state and federal constitutions because we find that Plan 14–B is in fact in harmony with both constitutions. Since there is no justification for the state constitutional violations in the reapportionment scheme of H.B. 830 we affirm the district court's holding that H.B. 830, codified as I.C. § 67–202, is unconstitutional.

## II

### THE STATUS OF THE 1984 LEGISLATURE

The trial court in its 1982 judgment at the close of the first trial (and prior to the *Hellar I* appeal) ordered:

"In the event that the next regularly convened Idaho State Legislature does not pass a constitutional, legislative redistricting law pursuant to this Opinion, and provide for a Special Election thereunder during 1983, this Court will, *after a deadline of April 1, 1983*, enter a Court Ordered Legislative Redistricting and Order for a Special Legislative Election." 104 Idaho at 859, 664 P.2d at 766.

The 1983 legislative session adjourned on April 14, 1983, without ever taking up the matter of reapportionment, despite the fact no stay of the trial court order was sought by either party.

By its August 1983 decision (on appeal herein) the trial court: (1) declined to order a special election, deciding to permit the present legislature to sit in 1984, and (2) enjoined the future legislative elections except under Court Plan 14–B. Hellar urges that since the present apportionment of the Idaho legislature has been declared unconstitutional, that its de facto status is terminated and it can no longer sit, and therefore it was error to rescind the special legislative election. The trial court gave the following reasons for declining to order a special election:

"1. A Court of equity should endeavor to avoid disruption of their regular election processes that could make unreasonable or embarrassing demands on the state or counties. *(Reynolds v. Sims,* [377 U.S. 533, 84 S.Ct. at 1362, 1394, 12 L.Ed.2d 506])

"For that reason the Court modifies its Order of June 7th, 1982, requiring a special election in 1983.

"As testified to by Ben Ysursa, Chief Deputy, Secretary of State for Idaho, a special election with a primary and a general, would cost the various counties of the state $700,000 to $800,000 total.

"There would be insufficient time to mail out and receive back absentee ballots considering the various election time periods even under a compressed schedule. A certain number of voters would be disenfranchised as a result.

"2. The Court also concludes that such a special election would lead to voter confusion and create undue expense for the candidates for legislative office in conducting an election campaign in the fall of 1983 and then commencing another campaign in March 1984 pointing toward the May 1984 primaries.

"3. A more orderly election process will be accomplished by giving the voters, candidates and election officials an opportunity to study the Court's plan and make unhurried preparations for the 1984 election."

We agree with the reasoning of the trial court and would add two further considerations. The hour is now even later, this decision being entered only a few days before the 1984 legislature is scheduled to convene; in addition we note that Idaho state and local governments are facing many pressing problems, financial and otherwise, and the public interest would be ill-served by the delay which would be occasioned by a special election and the required reorganization of the legislature and its committees.

The next issue is the validity of any legislation enacted by the 1984 legislature. In *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the court noted that the remedial techniques in state legislative apportionment cases may differ with the circumstances of the challenged appor-

tionment and with varied local conditions. Noting that equitable considerations might justify a court in withholding immediate relief even though an existing apportionment scheme was found invalid, the court concluded that general equitable principals could be utilized in formulating the nature and timing of the relief granted. Subsequent cases to the same effect are *Ely v. Klahr*, 403 U.S. 108, 91 S.Ct. 1803, 29 L.Ed.2d 352 (1971), *Connor v. Williams*, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972), and *Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982). For the reasons stated above, we sustain the trial court's ruling that the legislature shall have de facto status to sit and enact legislation under the present apportionment scheme in 1984 and any legislative vacancies shall be filled in accordance with the H.B.–830 apportionment plan.

■ We do, however, modify that aspect of the trial court judgment wherein it was ordered that the next legislative election may be conducted only under Court Plan 14–B. The trial court correctly noted:

> "Reapportioning legislative bodies is a legislative task which Courts should make every effort not to pre-empt. *Wise v. Lipscomb*, 437 U.S. 535, 98 S.Ct. 2493 [57 L.Ed.2d 411] (1978); *Connor v. Finch*, 431 U.S. 407, 97 S.Ct. 1828 [52 L.Ed.2d 465] (1977); *Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751 [42 L.Ed.2d 766] (1975); *Caeser v. Williams*, 84 Idaho 254, 371 P.2d 241 (1962).
>
> "Whenever a Court declares an apportionment scheme unconstitutional, it is appropriate to afford a reasonable opportunity for the legislature to adopt a constitutional measure; and legislative bodies should assume that responsibility and not leave their apportionment task to the Courts."

Although Plan 14–B passes muster with both the United States and Idaho Constitutions and appears to be proper and well-designed in all respects, that is not to say that the legislature in its collective wisdom and in its collective knowledge of the state might not be able to design an even better or more suitable plan. Should the legislature desire to undertake that task, this court is willing to consider such a plan if enacted by the legislature and signed into law by the governor. Accordingly, the judgment and order of the trial court is modified as follows:

(1) This court shall retain jurisdiction of this case until further order.

(2) Should an alternative plan be enacted and signed into law, this court may, if either party files a petition with the court, review said plan, and for that purpose may appoint the Honorable Dar Cogswell, district judge, to sit as a special master to resolve any factual issues which this court may certify to said special master; thereafter, the court will determine the constitutionality of any alternative plan.

(3) The 1984 election shall be conducted under Plan 14–B (subject to correction for any unforeseen technical modification which might be approved by this court) unless the legislature enacts a constitutional alternative reapportionment plan.

III

DEFENDANTS' ALLEGATION OF
LACK OF FAIR TRIAL

■ The attorney general asserts defendants were denied a fair opportunity to prepare for trial and thereby denied due process.

At the time of the July 19, 1983 pretrial conference, which was held seven days prior to the opening day of trial on July 26, 1983, the plaintiffs prefiled fifty-one exhibits and provided the defendants with a witness list. Defendants then moved to vacate the trial date to prepare their case, which motion was denied.

As of July 19, 1983 the defendants had not filed a single interrogatory or request for admissions and had not noticed up a single deposition, despite the fact that the legislative leadership had announced its intention not to take up reapportionment as early as February, and *Heller I* was decided on June 7, 1983. The trial proceeded on

July 26, with the court permitting defendants to reserve their cross-examination of plaintiffs' witness until the completion of direct examination of all of plaintiffs' witnesses.

On August 2, 1983, after plaintiffs witnesses, Professor Stewart, Dr. Duncombe, and Susan Stacey, had earlier testified (but had not yet been cross-examined) and prior to the testimony of plaintiffs' witness Dr. Everson, the defense moved to recess the trial for the purpose of deposing those four witnesses.

The trial court denied the motion on the ground that, (1) as to the first three the defense had already heard their relevant testimony and the week's recess provided adequate opportunity to prepare cross-examination, and (2) as to Dr. Everson, the parties had earlier stipulated to the presentation of his testimony on August 2.

We note the record contains no affidavit or testimony justifying the failure of the defense to earlier prepare its case. Of even greater significance, there is neither affidavit nor testimony specifically detailing any surprise as to the nature of the testimony of any witness or as to any prejudice to the defense. Likewise, there is no showing as to any additional evidence the defense would have presented. The record reflects the trial court not only extended the defense every reasonable and usual courtesy, but also granted the defense extraordinary recesses and procedural accommodations.

## IV

## ATTORNEY FEES

The trial court awarded Hellar attorney fees under the "private attorney general theory." Respondents assert the court erred in awarding any attorney fees at all. At the outset we note that in those instances wherein attorney fees can properly be awarded, the award of attorney fees rests in the sound discretion of the trial court and the burden is on the person disputing the award to show an abuse of discretion. *Anderson v. Ethington*, 103 Idaho 658, 651 P.2d 923 (1982).

Before discussing the two alternative bases for the fees, certain aspects of the factual background should be noted. The record establishes that Hellar's attorney is a sole practitioner. There were periods during the litigation when he was obliged to close his office and concentrate solely on this litigation to the detriment of other fee generating clients. As a result of the extensive time demands, it was necessary that he borrow funds to meet his office obligations.

With the attorney general being asked by the legislature to defend H.B. 830, that office could not provide a defense of either Idaho Const. art. 3 § 5 or the interest of the people of Idaho as that interest has been determined both by the trial court and this court. Deputy Attorney General McClure has stipulated that the attorney general would not have brought action to challenge H.B. 830, although in July 1981 he warned the legislature that "if a reapportionment plan which divides counties should be challenged ... it would appear prima facia [sic] violation of the Idaho Constitution ..."

It is appropriate that the people of Idaho pay for the services rendered in their behalf if there is a proper legal basis for their doing so.

### A. The Private Attorney General Doctrine

The trial court granted attorney fees to Hellar under the Private Attorney General Doctrine standards as articulated in *Serrano v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977), which standards (although not applied) were recognized by this court in *County of Ada v. Red Steer Drive-Inns, Inc.*, 101 Idaho 94, 100, 609 P.2d 161, 167 (1980).

The trial court listed the three requirements of the rule and the facts which bring the case under the rule:

"1. The strength or societal importance of the public policy indicated by the litigation.

"The Plaintiff is correct in stating that there may well be no greater public policy in a constitutional representative democracy than the policy of insuring that the citizens are properly represented according to the Constitution. If the Legislature is unconstitutionally apportioned, a pall is cast over all legislation which the Legislature adopts.

"2. The necessity for private enforcement and the magnitude of the resultant burden on the Plaintiff. This criteria has been adequately answered heretofore. If the Plaintiffs had not filed their cause of action, H.B. 830 would not have been challenged.

"3. The number of people standing to benefit from the decision.

"The apportionment of the Idaho Legislature affects every Idaho citizen.

"Although the Idaho Supreme Court has alluded to the Private Attorney General Theory in the case of the *County of Ada v. Red Steer Drive-Inns of Nevada, Inc.,* [*supra*] 101 Idaho 94 [609 P.2d 94], the Court has not had a case as strong as the instant action for applying such theory. It would be hard to imagine a case which would be more appropriate for an award of attorney's fees under the Private Attorney General Theory than the instant case considering its magnitude and the number of Idaho citizens affected thereby."

Defendants argue that the rule in Idaho is that attorney fees may not be awarded in the absence of an express statute granting attorney fees and they cite our recent case of *Idaho Power Company v. Idaho Public Util. Comm'n,* 102 Idaho 744, 639 P.2d 442 (1981), in support of that argument. There we stated:

"The Idaho Legislature has authorized the award of attorney fees in only a few clearly defined circumstances. Idaho Code §§ 12–120 and 12–121 allow the courts to set attorney fees in civil damage suits under certain conditions. Notably, by adopting I.R.C.P. 54(e)(1), the court has restricted the award of attorney fees under § 12–121 to those cases brought, pursued or defended frivolously, unreasonably or without foundation ... it is clear that the Idaho legislature has provided for the award of attorney fees specifically when it so intends, and only when it so intends." 102 Idaho at 751, 639 P.2d at 449.

■■■■ We continue to adhere to the so-called "American rule" to the effect that attorney fees are to be awarded only where they are authorized by statute or contract. Since I.C. § 12–121 provides the trial court with discretion to award fees to the prevailing party, there is a statutory basis and the question then becomes whether the I.R. C.P. 54(e)(1) limitation restricting the award to those cases which are "defended frivolously, unreasonably, or without foundation" is applicable. We hold that the limitation does not apply where, as here, the award of attorney fees is under the Private Attorney General Doctrine.

■■ Respondents further argue that the amount of the fees awarded is excessive, especially that portion of the award granting an "enhancement" of $25,200. A review of the record establishes that the amount of time expended appears to be large, even for a case of this magnitude and that the plaintiffs' attorney will be adequately and properly compensated without the enhancement award. Accordingly the award of attorney fees is reduced by $25,200.

## B. Award of Fees Under Civil Rights Act, 42 U.S.C. 1988

Hellar asserts that the fees should also have been founded on the provisions of the Civil Rights Act, 42 U.S.C.A. §§ 1983 and 1988. The trial court noted:

"As an additional ground for relief, Plaintiff claims fees under the Civil Rights Attorney's Fee Act, 42 USC 1988.

"Although there is some merit to this contention, the court feels that a finding in that regard is not necessary in view of the Court's decision to award attorney's fees under the Private Attorney General Theory."

We likewise do not reach that issue for the same reason.

## V

## SUMMARY AND CONCLUSION

The judgment of the trial court is affirmed in all respects except as hereinabove modified.

Costs and attorney fees on appeal to the plaintiffs.

DONALDSON, C.J., and BAKES and BISTLINE, JJ., concur.

## APPENDIX A

## "RATIONAL STATE POLICY OF PRESERVING COUNTY BOUNDARIES

"Contrary to the testimony of Defendant's witnesses, the Court finds by a preponderance of the evidence that Idaho has followed a state policy of preserving county boundaries as manifested by Art. 3, Sec. 5 of the Idaho Constitution.

This policy has been followed for decades and has been applied consistently throughout the state.

As set forth on page 181, *"Idaho Blue Book"* 1981–82, published by Secretary of State, Pete Cenarrusa, for the State of Idaho, of which the Court takes judicial notice,

'The primary unit of local government in Idaho is the county. As provided in the Constitution, the organization of county government is uniform throughout the state's forty-four (44) counties. Counties are governed by a three (3) member Board of Commissioners who exercise both legislative and executive powers and perform many miscellaneous functions. They also have an elected Sheriff, Treasurer, Coroner, Prosecuting Attorney, and a Clerk who is ex-officio Auditor as well as Recorder and Clerk of the District Court.

'County Commissioners are elected for alternating two (2) and four (4) year terms. Each county is divided into three (3) districts. Commissioners are elected by the voters of the entire county but must live within the district that they represent.

'Idaho counties are political subdivisions of the state. They serve as an administrative arm of state government providing services required by state law such as law enforcement, welfare and road maintenance. In addition, counties have, in recent years, tended to take on functions of a quasi-municipal character providing urban services such as planning and zoning, water supply and sewage disposal, which have traditionally been provided by incorporated cities.'

"As testified to by House Speaker, Tom Stivers, *'Counties do represent social and economic interests of the state.'*

"An apportionment plan should be adopted with only minor variations in populations, but which would follow county boundaries for the following reasons:

"1. Art. 3, Sec. 5 of the Idaho Constitution provides that no county shall be divided in creating such districts.

"2. Idaho is uniquely situated by virtue of its topography, social, economic and religious interests. "'Idaho is an up and down land. Its mountains rise to 12,662 feet and its lowest elevation is 736. Idaho is a land uncrowded. Its 83,557 square miles did not carry an average of 10 persons per square mile until the late 1970's. Idaho has 788 square miles of inland water, including more than 2000 lakes. It has the deepest canyons on the North American continent. It has 42 peaks more than 10,-000 feet in elevation, the highest being Mt. Borah. Idaho has prairies, both high and low, and rolling hills and meadows that sustain a vast population of wildlife and domestic animals.

" 'It took millions of years of volcanic action, uplifts, changing seas and eroding rivers to create the land mass that is Idaho. Sylviah H. Ross and Carl N. Savage, writing in Idaho Earth Science, a publication of the Idaho Bureau of Mines and geology (1967), say: "Idaho has landscapes and geologic phenomena that perhaps are not eq-

ualled in variety within the boundaries of any other single state.'"

"3. Idaho stretches over six hundred miles from the Canadian border on the north to the Nevada-Utah border on the south and over four hundred miles from the Oregon border on the west to the Wyoming on the east.

"4. A mountain range bisects much of the state running in a north-south direction. Transportation is almost impossible from east to west except along the Snake River in the south, Highway 2 in the extreme north and the Lolo Trail in central Idaho and travel is difficult from north to south.

"5. Sixty-three percent (63%) of the people in Idaho live in nine of the forty-four counties. Nine counties have a population of less than 3,500.

"6. Idaho lies in two time zones. There are three major regions in Idaho bound together by transportation, economics, and communications. Our three major universities occupy a place in each region.

"7. 'Geographically, then, Idaho will always be a sectionalized state. Economically, probably it will continue to be divided for sometime to come in its northern, southwestern and southeastern segments. There has been a saying for many years that Idaho has three capitols: Spokane, Washington for north Idaho, Salt Lake City, Utah for southeastern Idaho; and Boise for the remainder of the state.' (Blue Book, *supra* page 13; also testimony of Jenkin Palmer)

"8. The Court can take judicial notice that north Idaho is more closely tied to Spokane, Washington, for social, economic and transportation reasons than to other parts of the State of Idaho.

"9. In order to promote the interests of each area in the three major areas of the state, the various counties of the state have always been the political, geographic, economic, and social unit upon which people depend for the functioning of their local governments.

"10. Property taxes are collected on a county basis and various taxing districts rarely, if ever, cross county lines. Out of 856 taxing districts in Idaho, witness Don Loveland could think of only a few that crossed county lines.

"11. Law enforcement is based on the county sheriff's department and various city police departments within that county.

"12. Counties, and cities within those counties, are authorized by statute to establish planning and zoning regulations to promote and protect property rights and health and safety within their boundaries. (I.C. § 67–6501—Local Planning Act of 1975)

"13. Each county has its own special economic and social needs and the needs are different and distinctive ranging from timber, mining and tourist economies of north Idaho, to the rolling, dry farming wheatlands and timber in central Idaho, to the irrigated row crops, cattle, and sheep farming and somewhat industrialized industries of south Idaho.

"14. Counties are the primary administrative agencies of government in Idaho and one need go no further than to examine the powers and duties of counties as set forth in the statutes of our Idaho Code.

"15. It has been historically the policy of the State that counties remain in that position and this is a rational state policy for Idaho.

"16. As testified to by Dr. Sydney Duncombe, University of Idaho Political Scientist, counties are the senior institution of government and should be preserved and strengthened. Legislators are more attuned to county needs. Political parties through their central committees are organized on a county basis. County boundaries are more understandable to the voters than obscure legislative district lines contained in H.B. 830.

"H.B. 830 fails to consider the Idaho Constitution and fails to consider the rational state policy of Idaho in preserving county boundaries."

BISTLINE, Justice, concurring specially.

I concur in the majority decision in all respects except that I would additionally award attorney fees to plaintiffs below under 42 U.S.C. § 1988.

SHEPARD, Justice, concurring in part and dissenting in part.

I concur in much of the majority opinion, *i.e.*, that portion holding that the legislature should be given an opportunity to design a plan of legislative reapportionment which satisfies both the United States Constitution's requirement of one man, one vote, and the prohibition contained in Idaho Const. art. 3, § 5, that counties shall not be divided in creating legislative districts. *See* Shepard, J. dissenting in *Hellar v. Cenarrusa*, 104 Idaho 858, 664 P.2d 765 (1983). Necessarily, I agree with that part of the majority which affirms the denial of special elections and confirms at least a de facto status of the 1984 legislature. I agree also with the holding of the majority that this Court should retain jurisdiction of the cause until further order. The cause has been up and down in Idaho's judicial system for too long a period of time, and no purpose would be served in extending the time by requiring a further excursion to the trial court.

I also concur with the majority's disposition of the "lack of fair trial" issue and would only further note that, although this Court's prior decision was filed on June 7, 1983, the cause has been pendant since April of 1982. In view of those circumstances and, as admitted by all parties, the instant cause being of extreme importance to the entire people of the State of Idaho and critical to the very foundation of continuing state government, it is unseemly, ludicrous and frivolous to assert that counsel was unprepared at trial; and when the fault therefor is attempted to be placed upon the trial judge under the circumstances well pointed out by the majority, the assertion verges on contumacy. I agree with the majority as it approves the award of attorneys' fees.

I dissent, however, from that portion of the majority which carte blanche approves plan 14–B as satisfying both the United States and Idaho Constitutions and "appear[ing] to be proper and well designed in all respects ...," and I further dissent from the holding of the majority that "the 1984 election shall be conducted under plan 14–B ... unless the legislature enacts a constitutional alternative reapportionment plan."

I further disagree with the majority's treatment of the "aggregate" method of statistical analysis versus the "component" method of statistical analysis. The majority merely affirms the district court, without any process of reasoning other than a reference to the United States Supreme Court's likewise abdicating its judicial responsibilities in failing to "enter this imbroglio of mathematical manipulation." *Mahan v. Howell*, 410 U.S. 315, 319, 93 S.Ct. 979, 982, 35 L.Ed.2d 320 (1973). If, as contended by defendants, the correct method of computation is "component," then plan 14–B has a deviation of 41.3% and is undoubtedly violative of the federal constitution. I find no support for the majority's assertion that the "aggregate" has been blessed by the United States Supreme Court and *Boyer v. Gardner*, 540 F.Supp. 624 (D.C.N.H.1982), is, at best, only persuasive.

I also disagree with the majority's conclusion that even "supposing the proper statistical method yielded a population deviation of 41.3%," nevertheless such deviation has been approved in *Brown v. Thompson*, 462 U.S. 835, 103 S.Ct. 2690, 77 L.Ed.2d 214 (1983). What the majority does not tell us of *Brown v. Thompson, supra,* is that it is a 3–2–4 decision and, because of the maximum deviation of 89%, simply cannot be reconciled with previous opinions of the Court unless *Reynolds v. Sims* and its progeny are overruled, but we are told that those cases still are the foundation of legislative apportionment.

As characterized by one member of the Court, "it is worth stressing how extraordinarily narrow it is, and how empty of likely

precedential value." *Id.*, 103 S.Ct. at 2700 (Brennan, J., dissenting). As pointed out in the opinions of the Court, Brown v. Thompson involved a challenge to only a small part of Wyoming's legislative apportionment scheme. The two specially concurring members of that Court indicated that their adherence to the result came only because the challenge was so narrow and that, had the challenge been to a statewide legislative plan, the majority would not have had its votes. In my judgment, logic and reason are clearly on the side of the four-man "dissent," particularly in view of the 5–4 decision in *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), handed down on the same day. *Karcher* struck down as unconstitutional the reapportionment of New Jersey because of an average deviation between districts of 0.1384% or, stated differently, a deviation of 726 people from the average district population of 526,059.

The recent history of legislative reapportionment in Idaho may furnish some perspective on the action of the courts in this nebulous field. Prior to this state's 1962 elections, George Caesar filed an action in the district court, alleging that the then legislative apportionment was unconstitutional, in that equal representation was not provided to the people of the more populous counties of the state. The district court agreed with Caesar, and the matter was appealed to this Court. *Caesar v. Williams*, 84 Idaho 254, 371 P.2d 241 (1962). This Court reversed the decision of the trial court in a 3–2 decision, holding that the constitutional requirement of one representative per county made mathematical equality impossible, and that such lack of equality, although great, did not violate the equal protection clause of either the United States or the Idaho Constitution.

In 1963, *Hearne v. Smylie*, 225 F.Supp. 645 (1964), the plaintiffs asserted that the Idaho Constitution requiring at least one member of the House and one member of the Senate to be elected from each county, together with the statutes providing for the apportionment of the Idaho legislature were violative of the equal protection and due process guarantees of the fourteenth amendment to the United States Constitution. The three judge court, in a split decision, denied the relief sought by plaintiffs and some of the language of that court, while probably of only historical interest, nevertheless demonstrates how far we have "progressed" or "regressed" since that time. The court said, 225 F.Supp. at 655–656:

"In the view of one observer, 'it taxes the imagination to conjure a vision of the marshals breathing down the necks of the members of the [Idaho legislature] * * * while they parrot the requisite number of "ayes", or the prosecution for contempt of legislators who voted "nay" on the district court's apportionment bill'

...

"* * * Thus, plaintiffs in effect argue that this Court should attempt to 'bluff' or 'spur' the Idaho Legislature into action; that we should issue a 'left-handed' injunction whereby the Court would attempt to accomplish indirectly what it could not possibly bring about directly...

"* * * As stated earlier, were we to grant the relief plaintiffs ask and thereby deprive Idaho of a **de jure** Legislature, surely we would at the same time probably deprive the people of Idaho, at least temporarily, of 'a Republican Form of Government' guaranteed to them by Article IV, § 4, of the Federal Constitution ...

'* * * We should not willingly so stultify ourselves, or so prostitute the power and process of this Court. Beyond the age-old policy against advisory opinions, and **a fortiori** advisory judgments ... we would echo the warning of Mr. Justice Frankfurter that 'there is nothing judicially more unseemly nor more self-defeating than for * * * [a] Court to make **in terrorem** pronouncements, to indulge in merely empty rhetoric, sounding a word of promise to the ear, sure to be disappointing to the hope.'"

It is perhaps not surprising that in the wake of *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), and related cases, the action of the federal district court panel in *Hearne v. Smylie, supra,* was summarily reversed without even the dignity of briefing or argument. 378 U.S. 563, 84 S.Ct. 1917, 12 L.Ed.2d 1036 (1964). Hence, the idea of counties as areas deserving one, and only one, senator, and at least one representative, disappeared from the Idaho scene, and legislative districting came into place.

In *Summers v. Cenarrusa,* 342 F.Supp. 288 (1972), another three judge panel of the federal district court reviewed the state's then-existing legislative reapportionment scheme and stated, 342 F.Supp. at 289:

"[T]he Legislature made a conscientious and good faith effort to create districts of equal population as near as practicable, even though there are deviations from equality between districts. In creating the districts, the Legislature took into consideration anticipated increases in population, the exclusion of non-resident college students, which were included in the 1970 census, and, insofar as practical, existing county, natural and historical boundary lines so as to create districts with similar economical and community interests and to provide the most effective representation possible to the citizens of Idaho in the Legislature."

The court noted that the legislative districts ranged from 18,207 to 22,162 persons per legislator, or from 10.62% over-represented to 8.79% under-represented. Further, the court pointed out that ten counties had been divided so as to create 14 legislative districts. The court held that the deviation in population among the legislative districts was unavoidable and "was the most reasonable and practical in carrying out the one man, one vote concept as required by the decisions of the Supreme Court of the United States." *Id.,* 342 F.Supp. at 290. Of most importance to the case at bar is the clear statement: "It is our opinion that in order for the Legislature to enact a practical reapportionment

plan so as to comply with the requirements of the United States Constitution, it *could not* and *was not required* to comply with the Idaho Constitutional prohibition against dividing counties." *Id.,* 342 F.Supp. at 290 (emphasis added). I suggest that such language is clear, concise and inescapable. Whether the holding of that court is binding here, I leave to others. The question might well be posed, "Was the legislature entitled to accept and act on that decision and whose opinion is the upcoming legislature to accept, that federal court decision or the decision of the state district court which this Court affirms today?" As I read the majority, it provides no answer. While the United States Supreme Court, 413 U.S. 906, 93 S.Ct. 3037, 37 L.Ed.2d 1018 (1973), vacated that judgment and remanded to the district court for further consideration, on May 3, 1974, in an unpublished opinion, the district court reaffirmed its earlier decision in favor of the defendants.

As above stated, I must also dissent from the holding of the majority that if the 1984 legislature does not act, plan 14–B automatically goes into effect, and the 1984 election shall then be conducted in accordance with that reapportionment. In my judgment, the able trial judge labored long, mightily, and patiently, and finally appeared to have no alternative but the adoption of one of the plans submitted and designed by plaintiffs since defendants defaulted in that regard. Nevertheless, I must disagree with the majority wherein it states that plan 14–B "appears to be proper and well designed in all respects."

I remain of the view that the original question presented was whether a reapportionment plan could be drawn which satisfied the requirements of both the federal and the Idaho constitutions. *See Hellar v. Cenarrusa I* (Shepard, J., dissenting). The trial court has determined, and this Court evidently affirms, that such a legislative reapportionment scheme can be drawn. There seems to be no doubt but that H.B. 830 satisfied the requirements of the federal constitution. [Initially, plaintiffs alleged

that H.B. 830 invidiously discriminated against Idaho's Indian population, in violation of the federal constitution, but that question evidently is not an issue and is not decided today.] It seems equally clear that H.B. 830, as a matter of law, violates the literal language of the Idaho Constitution prohibiting the division of counties. As above stated, today's holding by the majority is that plan 14–B is not violative of the federal constitution.

Hence, in my mind, there is no federal question presented and what federal court decisions say or do not say regarding federal questions—how they invalidate or affirm legislative apportionment schemes—are of mere academic interest only insofar as their reasoning may be acceptable to this Court and to this state. Decisions such as *Boyer v. Gardner*, that appear to validate floterial districts as acceptable to the federal constitution, are not remotely binding here and are persuasive only to the extent that the reasoning underpinning the decision is applicable and acceptable in Idaho.

Nevertheless, the majority today does not even deign to mention, much less discuss, cases from our sister state Supreme Courts dealing with almost identical problems inherent in their legislative apportionment, vis a vis, their constitutional requirements. *See Logan v. O'Neill*, 187 Conn. 721, 448 A.2d 1306 (1982); *Merriam v. Secretary of the Commonwealth*, 375 Mass. 246, 376 N.E.2d 838 (1978); *Opinion of the Justices*, 307 A.2d 198 (Me.1973); *Commonwealth ex rel. Specter v. Levin*, 293 A.2d 15 (Pa.), *appeal dismissed*, 409 U.S. 810, 93 S.Ct. 44, 34 L.Ed.2d 65 (1972); *Wells v. White*, 274 Ark. 197, 623 S.W.2d 187 (1981), *cert. denied*, 456 U.S. 906, 102 S.Ct. 1753, 72 L.Ed.2d 163 (1982); *In Re Reapportionment of Colorado General Assembly*, 647 P.2d 191 (Colo.1982); *State ex rel. Lockert v. Crowell*, 631 S.W.2d 702 (Tenn.1982); *People ex rel. Scott v. Grivetti*, 50 Ill.2d 156, 277 N.E.2d 881, *cert. denied*, 407 U.S. 921, 92 S.Ct. 2460, 32 L.Ed.2d 806 (1972).

At bottom then, this Court has today determined that H.B. 830 is dead, having been shot down in constitutional flames. From its ashes arise the judicially created phoenix of plan 14–B. According to this Court, the creature "appears to be proper and well designed in all respects." Whatever other faults existed in defendants' case at trial, they well and truly attacked plan 14–B in certain of its facets, *i.e.*, floterial and multi-member districts. That attack is well preserved on this appeal. However, again, the majority does not deign to mention the assertion of error, much less discuss it. I suggest that under these circumstances we deal solely with a question of state law, without the interposition of federal constitutional principles.

While floterial districts in plan 14–B were admittedly designed to achieve population equality, it is admitted and beyond question that a reapportionment plan can be designed to satisfy both the federal and the state constitutions without the existence of floterial districts.

While the trial court and this Court made much of the desire of sitting legislators to preserve inviolate their seats in any legislative reapportionment, nevertheless the record here demonstrates the appearance at the trial court of many former government officials who presumably had no stake in the proceedings and who testified as to the impracticability and undesirability of floterial districts in Idaho apportionment schemes. Those opinions were based on perceived voter confusion and consequent voter apathy, lack of meaningful representation, over-representation of majority groups with under-representation of minority groups, and difficulty and instability in future reapportionments. Those opinions were in part reactions to the massive size of some of the floterial districts. For example, proposed district 13 would appear to encompass Adams, Valley, Washington, Payette, Gem, Boise, Canyon, Elmore and Owyhee Counties, with a geography approximately 225 miles in length and over 100 miles in width.

As I view the majority, it gives no credence, consideration or mention to that evidence at trial, nor to the arguments presented on appeal. I believe the majority seriously errs when it indicates that, in the absence of legislative action in 1984, plan 14–B will automatically become the law of the State of Idaho. I believe it does so without any consideration of the serious deficiencies which have been alleged and testified to at trial and brought firmly to the Court's attention on this appeal.

In sum, I agree that this Court should retain jurisdiction of the cause. I further agree that the 1984 legislature should be given the opportunity to reapportion itself. I fervently urge the legislature to act to discharge its responsibility in accordance with its powers. As indicated in art. 2, § 1 of Idaho Constitution, "no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this constitution expressly directed or permitted." In my view, the power and duty of legislative reapportionment rest with the legislature. The power does not belong to nor should it be exercised by, the judicial department of government, albeit if there be a legislative abdication of its power and duty, the courts will be required to act in the legislature's stead. In my opinion, with this Court's retaining jurisdiction of the cause, it could and should reexamine the question of legislative reapportionment, whether or not the 1984 legislature acts to reapportion itself.