[No. 52433-5.   En Banc.   October 30, 1986.]

BLUE SKY ADVOCATES, *Appellant,* v. THE STATE OF WASHINGTON, *Respondent.*

*Mansfield, Reinbold & Gardner* and *Rodney M. Reinbold,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Shirley W. Battan, Assistant,* for respondent.

DURHAM, J.—Blue Sky Advocates (Blue Sky), a nonprofit corporation, characterizing this as an action against the Attorney General, claims that either a malpractice claim or the private attorney general doctrine entitles it to attorney fees and other expenses of its involvement in Energy Facility Site Evaluation Counsel (EFSEC) hearings. The trial court dismissed Blue Sky's action on summary judgment. We affirm the trial court and hold that RCW 80.50.080 does not contemplate malpractice suits against the Attorney General. We also reject the private attorney general doctrine.

Washington Water Power Company initiated proceedings before EFSEC by filing an application for site certification for a proposed 2,200–megawatt coal–fired electrical generating facility at Creston in Lincoln County (the Creston project). Pursuant to RCW 80.50.080, the Attorney General appointed an assistant attorney general as "counsel for the environment". In the fall of 1980, counsel for the environment investigated the potential environmental impact of the Creston project. He visited the proposed site with government officials, reconnoitered the area, and contacted possible expert witnesses regarding the potential impact of the Creston project. He identified several issues, consulted with officials of the Environmental Protection Agency, and obtained expert witness referrals from the staff and faculty at two state universities. He also consulted with government officials and area residents in Lewis County regarding

a similar coal–fired electrical generating facility undertaken by Washington Water Power Company in the Centralia area.

In October 1980, EFSEC conducted zoning hearings and open public meetings throughout Eastern Washington. Counsel for the environment attended each zoning hearing and objected to proposed findings of consistency and compliance with the land use plans and zoning ordinances in Lincoln County. The open public meetings were well attended. Counsel for the environment explained his role at each meeting and solicited comments from the public. Only two people voiced concerns to him. One of them was a local wheat farmer, who explained that he was one of a number of wheat farmers in the area who were concerned about the Creston project. Counsel for the environment explained that his role was to represent the state–wide public and its interest in the environment, an interest that might differ from that of a special interest group with specific concerns. He suggested that Lincoln County wheat farmers intervene separately in the EFSEC proceedings if they had specific concerns about impacts on wheat. Blue Sky was subsequently formed by Lincoln County wheat farmers and citizens concerned about damage to wheat crops from air pollution.

Counsel for the environment was never contacted by Blue Sky at any of the public meetings. After the public meetings, he consulted with the Monsanto Research Corporation of Dayton, Ohio, an independent scientific facility, and obtained its opinion that if the Creston project was built to the specifications in the Washington Water Power Company's application, environmental damage would be greatly ameliorated or eliminated. He then consulted with his superior in the Attorney General's office to determine if he should participate in the adversarial phase of the EFSEC proceedings. They apparently decided that the Attorney General's office was not in a position to fund environmental studies and that instead they would rely upon the Department of Ecology, Department of Fisheries,

and Department of Game to take positions on environmental issues in the proceedings. Their decision was based in part upon the lack of opposition expressed in the public meetings. Counsel for the environment decided to take a position tentatively approving the Creston project and to simply monitor the subsequent adversarial hearings.

Counsel for the environment attended only a few of the numerous adversarial hearings. He reviewed the prefiled pleadings and direct testimony and was in contact with other assistant attorneys general representing the other state agencies participating in the hearings. He did argue against the proposed transmission line corridor and was ultimately successful.

At the close of the hearings, Blue Sky petitioned EFSEC to intervene. EFSEC denied its petition. Counsel for the environment was first contacted by Blue Sky's counsel at or after the close of the final adversarial EFSEC hearing. He advised Blue Sky's counsel that he would support a motion by Blue Sky for reconsideration of the denial of its petition for intervention.

Blue Sky's motion for reconsideration was denied by EFSEC at a hearing in January 1982. Blue Sky filed a petition for review in February 1982 in Thurston County Superior Court. In June 1982, the trial judge issued a memorandum opinion holding that EFSEC's denial of the petition for intervention was clearly erroneous.

The EFSEC reopened the adversarial hearings in July 1982 and granted Blue Sky intervenor status on the issues of sulfur dioxide and acid rain effects on crop yields. Additional testimony was taken from Blue Sky's expert witnesses.[1] EFSEC then amended its recommendation. Blue Sky succeeded in obtaining a reduction in sulfur dioxide emissions from the proposed Creston project. Order 645 of EFSEC's findings and conclusions reflected changes due to Blue Sky's intervention as follows: "Emissions controlled

---

[1] Counsel for the environment obtained partial funding from the Office of the Attorney General for two of Blue Sky's witnesses.

within these limits will reduce total $SO_2$ emissions to the atmosphere by as much as one-third over the Applicant's proposal, in a given year."

Blue Sky raised and spent $58,027.05. It paid $6,849 in attorney fees. Its attorney claims he is still owed $24,265.42 in attorney fees and expenses. Two other attorneys are owed $1,600 and $3,945.79.

Blue Sky sued the State[2] in Thurston County Superior Court for $70,000 as reimbursement for the monies spent in the EFSEC proceedings.[3] The State moved to dismiss the complaint for failure to state a claim upon which relief can be granted, pursuant to CR 12(b)(6). Blue Sky then moved for summary judgment based on the complaint and an affidavit submitted by the attorney for Blue Sky. The State filed an affidavit of counsel for the environment. The trial court treated the State's CR 12(b)(6) motion to dismiss as a motion for summary judgment, having considered matters outside the pleadings. It denied Blue Sky's motion and granted the State's motion to dismiss. Blue Sky appealed. The Court of Appeals certified the case to this court.

## MALPRACTICE CLAIM

Blue Sky bases its action first upon a malpractice theory. Pursuant to RCW 80.50.080, the Attorney General appointed counsel for the environment to participate in the Creston project hearings before EFSEC. The full text of the statute reads:

> After the council has received a site application, the attorney general shall appoint an assistant attorney general as a counsel for the environment. The counsel for the environment shall represent the public and its interest in protecting the quality of the environment. Costs incurred by the counsel for the environment in the performance of

[2]Only the State was named as a defendant in the complaint and amended complaint. Nevertheless, Blue Sky characterizes this as an action against the Attorney General.

[3]Blue Sky is apparently suing for fund raising and organizational expenses in addition to the attorney fees enumerated above.

these duties shall be charged to the office of the attorney general, and shall not be a charge against the appropriation to the energy facility site evaluation council. He shall be accorded all the rights, privileges and responsibilities of an attorney representing a party in a formal action. This section shall not be construed to prevent any person from being heard or represented by counsel in accordance with the other provisions of this chapter.

RCW 80.50.080. Blue sky claims that this statute establishes both a duty and a standard of care which make the Attorney General liable to Blue Sky in malpractice.

This court has not previously addressed the nature of the Attorney General's duty in this context. Two decisions are, however, instructive. *See Berge v. Gorton,* 88 Wn.2d 756, 567 P.2d 187 (1977); *Boe v. Gorton,* 88 Wn.2d 773, 567 P.2d 197 (1977). In those cases, taxpayers sued the Attorney General for refusing to file lawsuits to recover state funds disbursed as tuition supplements to students attending private colleges and universities. After the tuition supplements had been paid, this court had held in *Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973) that the legislation authorizing the supplements was unconstitutional.

In *Berge v. Gorton,* the court analyzed the Attorney General's duty pursuant to a different statute than the one at issue here. RCW 43.10.030(2)[4] designated the Attorney General as responsible for bringing actions on behalf of state officers, departments, and agencies. The court held that the duty imposed upon the Attorney General was not an absolute one to initiate litigation, but a duty to exercise discretion. *Berge,* at 761–62. Suits against the Attorney General for failure to file lawsuits must, therefore, claim an abuse of discretion. *Berge,* at 762. An action is an abuse of discretion if it is "arbitrary and capricious, that is, 'wilful and unreasoning action, action without consideration and

---

[4] "The attorney general shall:

"...

"(2) Institute and prosecute all actions and proceedings for, or for the use of the state, which may be necessary in the execution of the duties of any state officer;" RCW 43.10.030(2).

in disregard of the facts and circumstances . . .'" *Berge,* at 762 (quoting *In re Buffelen Lumber & Mfg. Co.,* 32 Wn.2d 205, 209, 201 P.2d 194 (1948)). *Buffelen Lumber* also held: "Action is not arbitrary or capricious when exercised honestly and upon due consideration where there is room for two opinions, however much it may be believed that an erroneous conclusion was reached.'" *Buffelen Lumber,* at 209 (quoting *Sweitzer v. Industrial Ins. Comm'n,* 116 Wash. 398, 401, 199 P. 724 (1921)).

*Boe v. Gorton, supra,* involved the same issues as *Berge* but was brought as an application for a writ of mandamus. The court denied the writ, citing *Berge,* because the act the petitioner sought to compel was discretionary. *Boe,* at 774–75. *Accord, Young Ams. for Freedom v. Gorton,* 91 Wn.2d 204, 206–10, 588 P.2d 195 (1978) (constitution and statutes vest Attorney General with reasonable degree of discretion as official legal advisor; filing of amicus curiae briefs authorized).

Blue Sky argues that RCW 80.50.080 places the duties of counsel for the environment on a higher level than the Attorney General's other duties such as filing lawsuits. It points to the mandatory appointment of counsel for the environment as support for this proposition. Blue Sky also argues that the standard of care of counsel for the environment is prescribed by the statutory language reading: "He shall be accorded all the rights, privileges and responsibilities of an attorney representing a party in a formal action." RCW 80.50.080.

Blue Sky alleges in its complaint that the Attorney General did not provide counsel for the environment with adequate funding to represent the public and its interest in protecting the environment. Counsel for the environment attended only 4 out of 40 days of adversarial hearings. At those hearings, he argued against the proposed transmission line corridors. Blue Sky's complaint claims that an attorney exercising reasonable care in representing a party in a formal action would have investigated environmental impact, consulted expert witnesses, appeared at the hear-

ings, made oral arguments, cross-examined expert witnesses, and taken other action.

In *Berge v. Gorton,* at 764, this court held that in making a discretionary decision to file lawsuits, the Attorney General may consider the net monetary gain from the suits as well as their possible success. Thus, the Attorney General may take funding considerations into account in making discretionary decisions.

█ The legislative history of RCW 80.50.080 does not shed any light on the nature of the duty of counsel for the environment. The 1970 law was amended in 1977, however, to delete a requirement that counsel for the environment represent the public interest in protecting the quality of the environment "for the duration of the certification proceedings, until such time as the certification is issued or denied". Laws of 1970, 1st Ex. Sess., ch. 45, § 8, p. 319 (amended by Laws of 1977, 1st Ex. Sess., ch. 371, § 6, p. 1700). A duty to exercise the standard of care of a privately retained attorney is inconsistent with the discretion recognized by this change to terminate involvement in EFSEC hearings before final action is taken.

Blue Sky does not allege that counsel for the environment failed altogether to become involved in the hearings. Counsel for the environment made a conscientious effort to determine an environmentally advisable position on the Creston project and he solicited public input at the public meetings. He and his superiors made a reasoned decision that monitoring the adversarial hearings was sufficient and that advocacy was required on the transmission line corridor issue only.

RCW 80.50.080 must be interpreted as according the Attorney General discretion in the exercise of his duties as counsel for the environment. There is no evidence from either the language of the statute or its legislative history that the Legislature intended to impose a different standard than the abuse of discretion standard for reviewing acts of the Attorney General. The Attorney General here followed the statute explicitly.

Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); *Hartley v. State*, 103 Wn.2d 768, 774, 698 P.2d 77 (1985). Blue Sky does not allege facts from which reasonable persons could reach the conclusion that the Attorney General abused his discretion; therefore, summary judgment was properly granted. *Turngren v. King Cy.*, 104 Wn.2d 293, 312, 705 P.2d 258 (1985).

### PRIVATE ATTORNEY GENERAL DOCTRINE

Blue Sky claims, alternately, that it should be awarded its attorney fees, as well as other expenses, because it is eligible under the private attorney general doctrine. This doctrine, however, has not been adopted in this state. The latest decision of this court to consider the private attorney general doctrine was *Miotke v. Spokane*, 101 Wn.2d 307, 678 P.2d 803 (1984).

*Miotke* was a public nuisance action brought by landowners along the Spokane River against the City of Spokane and the State Department of Ecology for an injunction and damages. Raw sewage was being discharged into the river. This court affirmed an award of damages based upon the City's violation of a waste discharge permit.

In *Miotke*, three Justices argued for adoption of the private attorney general doctrine and for affirming an award of attorney fees for the injunctive phase of the trial under that theory. Two Justices concurred that attorney fees should be awarded, but under an eminent domain theory. That concurring opinion did not mention the private attorney general doctrine. Four Justices dissented on the award of attorney fees, specifically rejecting the private attorney general doctrine.

Because there was no constitutional majority on the issue in *Miotke*, the private attorney general doctrine was not approved in that opinion. This court had unanimously

rejected the doctrine prior to *Miotke* in *Swift v. Island Cy.,* 87 Wn.2d 348, 552 P.2d 175 (1976).

 The private attorney general doctrine as set out by the *Miotke* plurality was criticized in a dissent as without sufficient guidelines and too undefined. *Miotke,* at 342–43 (Dolliver, J., dissenting in part). The criteria for the doctrine suggested by the *Miotke* plurality also fail to serve the purpose of the private attorney general doctrine, which is to encourage private individuals to pursue legal remedies which will benefit the public. Note, *Implementing the Incentive Purpose of the Private Attorney General Exception—Miotke v. City of Spokane, 101 Wn.2d 307, 678 P.2d 803 (1984),* 60 Wash. L. Rev. 489, 489–90, 496–99 (1985).

We note that only California and Idaho have adopted the private attorney general doctrine.[5] The United States Supreme Court rejected the doctrine in *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 44 L. Ed. 2d 141, 95 S. Ct. 1612 (1975). In *Alyeska Pipeline,* the Court found that it was for Congress, not the judiciary, to fashion exceptions to the "American Rule" that the prevailing litigant is ordinarily not entitled to collect attorney fees from the loser. It cited numerous statutes enacted by Congress which allow courts discretion in specific cases to award attorney fees. As stated in *Alyeska Pipeline*:

> [C]ourts are not free to fashion drastic new rules with respect to the allowance of attorneys' fees to the prevailing party . . . or to pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases.

*Alyeska Pipeline,* at 269. We are convinced of the wisdom of this reasoning for our state system and adopt it. *Accord,*

---

[5]California adopted the private attorney general doctrine in *Serrano v. Priest,* 20 Cal. 3d 25, 42–48, 569 P.2d 1303, 141 Cal. Rptr. 315 (1977). The holding was codified by the California Legislature. Cal. Civ. Proc. Code § 1021.5 (West 1980). Idaho adopted the doctrine in *Hellar v. Cenarrusa,* 106 Idaho 571, 577–78, 682 P.2d 524 (1984). The California and Idaho versions both differ from the formulation of the doctrine stated by the *Miotke* plurality.

*Hamer v. Kirk,* 64 Ill. 2d 434, 441–42, 356 N.E.2d 524 (1976). We reject the private attorney general doctrine.

The Legislature has directed the Law Revision Commission to study the advisability of enacting the private attorney general doctrine and to report its findings and recommendations, including proposed legislation. Laws of 1983, ch. 127, § 2, p. 619.[6] It would be especially inappropriate for us to adopt the doctrine when the Legislature is deliberating it.

Where there is no contractual or statutory basis for an award of attorney fees, the traditional equitable grounds for an award of fees are available. For discussions of these, see *Miotke,* at 338–40, and *PUD 1 v. Kottsick,* 86 Wn.2d 388, 545 P.2d 1 (1976).

In summary, we affirm the trial court's dismissal of this case. RCW 80.50.080 imposes a duty on counsel for the environment to exercise discretion. The private attorney general doctrine does not apply in Washington.

DOLLIVER, C.J., BRACHTENBACH, ANDERSEN, and CALLOW, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DORE, J. (dissenting)—I believe the private attorney general doctrine should be followed in this state and that the appellant, Blue Sky Advocates, should recover its attorney fees from the State. I therefore dissent.

### THE AMERICAN RULE

In all other common law jurisdictions, the award of attorney fees depends on the outcome of the case. *Fee Shifting and the Implementation of Public Policy,* 47 Law & Contemp. Probs. 187, 188 (1984). In the United States, however, absent some statutory, equitable or contractual exception, each party must pay for his or her legal fees, regardless of the result of the case. This practice dates back before the 19th century. *See Arcambel v. Wiseman,* 3 U.S.

---

[6]We are unable to locate any report of the Law Revision Commission or any subsequently proposed legislation.

(3 Dall.) 306, 1 L. Ed. 613 (1796); *Hauenstein v. Lynham,* 100 U.S. 483, 25 L. Ed. 628 (1879). This facet of our legal system is so entrenched, and yet so unique, that it is referred to throughout all common law jurisdictions as the "American rule."

The United States Supreme Court explained the justification for the American rule in *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 18 L. Ed. 2d 475, 87 S. Ct. 1404 (1967). First, litigation is inherently a risky proposition, and a party should not be penalized for merely participating in a lawsuit. Second, the poor would be unduly discouraged from pursuing their legal rights if they feared that losing the case would also cost them their opponents' legal fees. Finally, the cost of proving the amount of legal fees would pose an undue burden on judicial administration. *Fleischmann,* at 718.

The State of Washington has always followed the American rule. *See Lovell v. House of the Good Shepherd,* 14 Wash. 211, 44 P. 253 (1896); *State ex rel. Macri v. Bremerton,* 8 Wn.2d 93, 111 P.2d 612 (1941). Nevertheless, this rule is not absolute. Certain statutes allow for attorney fees (*e.g.,* RCW 19.86, Consumer Protection Act), and this court has created exceptions to the American rule when overriding considerations of justice compel such a result. The majority recognizes the inherent power of this court to award attorney fees to a party involved in a lawsuit. The majority specifically states, referring to *PUD 1 v. Kottsick,* 86 Wn.2d 388, 545 P.2d 1 (1976), that "the traditional equitable grounds for an award of fees are available." Majority, at 122.

The *Kottsick* opinion describes the current equitable exceptions to the American rule. The first such exception has been referred to as the "common fund" rule. If a litigant succeeds in preserving or creating a common fund of money for the benefit of others as well as himself, the litigant may be entitled to receive his or her attorney fees from that fund. *See Peoples Nat'l Bank v. Jarvis,* 58 Wn.2d 627, 364 P.2d 436 (1961). This rule was first announced in

Washington in 1911 in the case of *Baker v. Seattle–Tacoma Power Co.,* 61 Wash. 578, 112 P. 647 (1911).

We recently expanded the "common fund" theory so that a litigant need not create or protect a specific monetary fund. If the litigant confers a substantial benefit on an ascertainable class, then fees may be awarded. *Grein v. Cavano,* 61 Wn.2d 498, 379 P.2d 209 (1963). I would note in passing that this decision was not based solely on "traditional equitable grounds," but instead represented an extension of the common fund principle by use of our inherent equitable powers.

Scarcely 10 years ago we again allowed attorney fees in a case which did not fit within the narrow constraints of the "common fund" doctrine. In *Weiss v. Bruno,* 83 Wn.2d 911, 523 P.2d 915 (1974), petitioners received attorney fees for their successful suit preventing the unconstitutional disbursement of state funds to private school students. The Attorney General's office, the State Treasurer, and the Superintendent of Public Instruction favored the unconstitutional delegation of funds, but the petitioners successfully brought an action saving the State millions of dollars. *See Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973). Our reason for allowing attorney fees was based on this court's inherent equitable powers. Furthermore, that inherent power to award fees was not bound by tradition. We specifically held that in regard to our inherent power to grant attorney fees "we are at liberty to set the boundaries of the exercise of that power." 83 Wn.2d at 914.

I therefore believe that the majority errs when it refuses to extend our inherent power to award fees based on the notion that only traditional exceptions to the American rule are permitted. Our decisions in *Grein* and *Weiss* clearly indicate that we would allow exceptions when equity required it, and a wholesale denial of the private attorney general doctrine on the basis that it represents a further exception to the American rule is therefore inappropriate and at odds with prior case law.

### THE PRIVATE ATTORNEY GENERAL DOCTRINE

In *Weiss,* this court granted attorney fees to successful individuals who, at great cost to themselves, saved the citizens of this state millions of dollars. In the case before us, this court refuses to grant attorney fees to the successful association which, at great cost to itself, saved the citizens of this state from excessive amounts of air pollution. I do not see any justification whatsoever for this dichotomy. I have no doubt that had this case concerned the citizens' pocketbooks, instead of their lungs, attorney fees would have been granted. Because there is no identifiable cash with which to pay the appellant for its laudable actions, this court will give it nothing at all. With such logic, it is little wonder that public interest lawsuits are brought so infrequently.

In *Miotke v. Spokane,* 101 Wn.2d 307, 678 P.2d 803 (1984), the lead opinion urged use of the private attorney general doctrine whenever three conditions were met: (1) the plaintiffs incur considerable economic expense, (2) the suit is aimed at an important legislative or constitutional policy, and (3) a large class of people benefit from the suit. These conditions, despite the majority's protestations to the contrary, would fulfill the purpose of the private attorney general doctrine. Individuals would be encouraged to pursue legal remedies which would benefit the public.

The majority has asserted that these criteria are too vague and undefined. Majority, at 121. I disagree. By limiting the doctrine to those cases involving plaintiffs who incur a large economic burden, sufficient guidance is given to the courts. The plaintiffs not only must spend a great deal of money without hope of being reimbursed by virtue of their success (an event particularly likely in equity cases), but also the likelihood of action by public officials must be minimal. Otherwise, the plaintiffs need not incur the expense of litigation for the public good, as instead those duly authorized public officials will absorb the cost.

The second and third conditions would also carefully define the situations in which this doctrine may be applied.

The second condition, that the suit be aimed at an important public policy, is the same condition implicitly inherent in our decision in *Weiss*. We held that the improper disbursement of large amounts of money in derogation of the constitution consisted of a sufficiently important public policy. *Accord, Serrano v. Priest,* 20 Cal. 3d 25, 569 P.2d 1303, 141 Cal. Rptr. 315 (1977). In *Miotke,* the lead opinion of this court held that the protection of the environment by preventing the discharge of raw sewage into the Spokane River clearly met the requirement of an important public policy. Protection of the State's environment, like protection of the State's funds, would qualify as protection of an important public policy. These criteria are sufficiently definite and narrow to limit the application of the private attorney general doctrine. Only a case designed to benefit large segments of the population, aimed at important legislative or constitutional provisions would qualify.

Finally, the majority concludes that it would be improper for this court to adopt the doctrine when the Legislature is deliberating it. Majority, at 122. The majority cites Laws of 1983, ch. 127, § 2, p. 619 which states:

> The law revision commission shall conduct a study to analyze and evaluate the issues involved in enacting legislation to allow attorneys' fees to a prevailing party who acts as a private attorney general. The commission shall report its findings and recommendations, including proposed legislation, to the legislature prior to January 1, 1984.

No such report was prepared. As the Legislature has not taken further action after this 1983 statute, I would decline to accept the majority's assertion that the Legislature is still in fact deliberating this subject.

## CONCLUSION

The appellant in this case should receive its attorney fees pursuant to the private attorney general doctrine. It has incurred a substantial economic burden from its actions, and because of the equitable nature of its suit, it could not hope to recover its fees by an award of damages. Further-

more, the state agencies responsible for protecting the environment from noxious air pollution, the Department of Ecology and the Attorney General's office, would not and did not attempt to shoulder the burden of the appellant by seeking to prevent the excess pollution.

Secondly, protection of the environment from significant quantities of air pollution is a benefit accruing to all people of this state. Securing the atmosphere from this pollution confers as great a benefit to the public as saving the taxpayers' funds. Finally, every person in the state should benefit by the actions of petitioners. Environmental protection, by its very nature, improves the lives of all citizens of this state, and not merely a discrete, isolated group of people.

I would adopt the private attorney general doctrine in this case and award the petitioner its attorney fees.

PEARSON and GOODLOE, JJ., concur with DORE, J.

Reconsideration denied December 9, 1986.