117 P.3d 1089 (2005)
Evelyne GRUNDY, Petitioner,
v.
THURSTON COUNTY, a municipal corporation and political subdivision of the State of Washington; The Brack Family Trust; Calvin Brack and Joyce M. Brack, Trustees, Respondents.
No. 73906-4.
Supreme Court of Washington, En Banc.
Argued February 24, 2004.
Decided July 28, 2005.
*1090 Barnett N. Kalikow, Kalikow & Gusa, PLLC, Olympia, for Petitioner.
Matthew Bryan Edwards, Owens Davies, PS, Jeffrey George Fancher, Olympia, for Respondents.
Richard M. Stephens, Green Stephens & Klinge, LLP, Bellevue, for Amicus Curiae Ian Bennett, Marcia Boyd, Ann Milner, Keith Milner, Brent Nicholson, Mary Katherine Nicholson, Diane Sharp, Donald Walker, Gloria Walker.
Harry Laurence Johnsen, Judith K. Bush, Lummi Indian Business Council, for Amicus Curiae Lummi Nation.
John Maurice Groen, Groen Stephens & Klinge, LLP, Russell Clayton Brooks, Pacific Legal Foundation, for Amicus Curiae Pacific Legal Foundation.
Jeffrey Murdock Eustis, Seattle, for Amicus Curiae Washington Environmental Council.
IRELAND, J.[*]
¶ 1 In this case, we consider whether a private nuisance claim brought by Evelyne Grundy, who alleges seawater damaged her property because her neighbors raised the height of their seawall, should be dismissed in light of the common enemy doctrine. We reverse the Court of Appeals dismissal of her private nuisance claim, and we hold that the common enemy doctrine does not apply to seawater.

FACTS
¶ 2 Evelyne Grundy owns property on the west side of Johnson Point in Thurston County. She has lived there since 1981. Adjoining property at the end of the point was purchased by the Brack Family Trust (Bracks) about 10 years later. Although the properties were each protected by a seawall, the Bracks' wall was about 12 inches lower than Grundy's. Seawater from Puget Sound regularly flooded a portion of the Bracks' property during winter storms.
¶ 3 The Bracks extensively remodeled the single family residence located on their property and made other improvements. In 1997, they sandbagged along their seawall, and in the fall of 1998, they sought to raise the seawall surrounding their property by 16 to 18 inches. They obtained hydraulic project approval from the Department of Fish and Wildlife and a determination from Thurston County that they were not required to obtain a permit under the Shoreline Management Act of 1971, chapter 90.58 RCW.[1] The *1091 stated purpose for raising the seawall was to prevent storm erosion and water intrusion.[2] Grundy received no notice of the government action.
¶ 4 Seawater diverted by the Bracks' sandbags during winter storms in 1998-99 caused Grundy's property to be damaged by seawater for the first time. Water came within about 22 feet of Grundy's foundation and destroyed 1,200 square feet of vegetation. Grundy worried that more severe storms would cause water to enter her home through ground-level vents, destroying electrical and heating fixtures and undermining the structure.
¶ 5 Construction of the addition to the Bracks' seawall began in March 1999. Because the eastern portion was raised first, Grundy's view of the project was obscured until construction was almost complete.

PROCEDURAL HISTORY
¶ 6 Grundy filed a nuisance action against Thurston County and the Bracks in November 1999. She claimed Thurston County created a public nuisance by improperly exempting the Bracks' project from the permitting process. She also claimed the Bracks' seawall constituted a private nuisance because it made her property vulnerable to flooding. She sought abatement and attorney fees.
¶ 7 The Bracks moved for summary judgment, arguing that Grundy was not entitled to challenge Thurston County's decision because she did not timely seek review under the Land Use Petition Act, chapter 36.70C RCW. The Bracks also argued that Grundy could present no evidence that raising the seawall impacted her property.
¶ 8 The trial court granted the Bracks' motion,[3] dismissing Grundy's cause of action as to the seawall[4] and ordering as follows:
The plaintiff's first cause of action is DISMISSED; this dismissal is without prejudice to any new claim the plaintiff may have against Thurston County for issuance of the shoreline exemption. Thurston County waives any objection to plaintiff amending the complaint to include such new cause of action upon plaintiff meeting all claim filing requirements.
Clerk's Papers (CP) at 94.
¶ 9 Grundy appealed, and the Court of Appeals affirmed, holding that Grundy's public nuisance claim was time-barred under the Land Use Petition Act and that the Bracks were entitled to prevent damage to their property under the common enemy doctrine. Grundy v. Brack Family Trust, 116 Wash. App. 625, 67 P.3d 500 (2003).
¶ 10 This Court granted Grundy's petition for review. Grundy v. Brack Family Trust, noted at 150 Wash.2d 1009, 79 P.3d 445 (2003).

ANALYSIS

Standard of Review
¶ 11 When reviewing a grant of summary judgment, an appellate court undertakes the same inquiry as the trial court. Wilson v. Steinbach, 98 Wash.2d 434, 437, 656 P.2d 1030 (1982); Schaaf v. Highfield, 127 Wash.2d 17, 21, 896 P.2d 665 (1995) ("This court reviews the facts and law with *1092 respect to summary judgment de novo."). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c); see also Dickgieser v. State, 153 Wash.2d 530, 535, 105 P.3d 26 (2005). "[T]he court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." Highline Sch. Dist. No. 401 v. Port of Seattle, 87 Wash.2d 6, 15, 548 P.2d 1085 (1976).

Nuisance Law
¶ 12 "Nuisance is `a substantial and unreasonable interference with the use and enjoyment of land.'" Bodin v. City of Stanwood, 79 Wash.App. 313, 318 n. 2, 901 P.2d 1065 (1995) (quoting 1 William H. Rodgers, Environmental Law § 2.2, at 33 (1986)).
¶ 13 Washington's law of nuisance is codified in chapter 7.48 RCW. Nuisance is broadly defined as "unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property." RCW 7.48.120.
¶ 14 A nuisance "which affects equally the rights of an entire community or neighborhood" is a public nuisance. RCW 7.48.130. Among the enumerated public nuisances is "[t]o obstruct or impede, without legal authority, the passage of any river, harbor, or collection of water." RCW 7.48.140(3). Any nuisance that does not fit the statutory definition of a public nuisance is a private nuisance. RCW 7.48.150.
¶ 15 An actionable nuisance is "whatever is injurious to health or indecent or offensive to the senses, or an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property." RCW 7.48.010. Any person whose property is injuriously affected or whose personal enjoyment is lessened by a nuisance may sue for damages and for injunctive relief to abate the nuisance. RCW 7.48.020.

Public Nuisance
¶ 16 In her complaint, Grundy expressly bases her claim of public nuisance on assertions that Thurston County wrongfully and illegally allowed the Bracks to raise their seawall. But the trial court did not determine the legality of the exemption the county issued to the Bracks. According to Grundy, the trial court "left the issue of the propriety or legality of the permit for determination in a damage action against the county if we chose to take that path. (Since a damage action will not redress the harm, which is a continuing nuisance in this case, we chose not to follow that course.)" Br. of Appellant at 8-9.
¶ 17 Thus, Grundy does not seek damages from the county for its decision to allow construction of the Bracks' seawall. Rather, she alleges that the Bracks' seawall is a nuisance in fact.[5] Her property is harmed because the Bracks' seawall is higher *1093 than her own. The relief she seeks is abatement of the nuisance.[6]
¶ 18 As the Court of Appeals noted, Thurston County is not a party to this appeal. Concerns about Grundy's due process rights and compliance with the Land Use Petition Act necessarily implicate the county  not the Bracks. Whether the county illegally issued an administrative shoreline exemption to the Bracks was not decided by the trial court, so it is not properly before us. RAP 7.3; Kruse v. Hemp, 121 Wash.2d 715, 721, 853 P.2d 1373 (1993) (Under RAP 7.3, this court has " § the authority to determine whether a matter is properly before it. . . . § "). Accordingly, we do not reach the public nuisance issue.

Private Nuisance and the Common Enemy Doctrine
¶ 19 The only issue properly before the appellate courts is Grundy's private nuisance action against the Bracks  and whether the common enemy doctrine applies to bar that action.
¶ 20 The Court of Appeals held that the Bracks were "entitled to prevent damage to their property from the vagrant surface water once confined in Puget Sound, even when a neighbor may be injured by their defense." Grundy, 116 Wash.App. at 636, 67 P.3d 500. We disagree.
¶ 21 "In its strictest form, the common enemy doctrine allows landowners to dispose of unwanted surface water in any way they see fit, without liability for resulting damage to one's neighbor." Currens v. Sleek, 138 Wash.2d 858, 861, 983 P.2d 626 (1999).
¶ 22 Washington courts first articulated the doctrine more than a century ago: "[S]urface water, caused by the falling of rain or the melting of snow, and that escaping from running streams and rivers, is regarded as an outlaw and a common enemy against which anyone may defend himself, even though by so doing injury may result to others." Cass v. Dicks, 14 Wash. 75, 78, 44 P. 113 (1896).[7]
¶ 23 As the Court of Appeals points out, the Cass court specifically mentioned seawalls:
If a land-owner whose lands are exposed to inroads of the sea, or to inundations from adjacent creeks or rivers, erects sea-walls or dams, for the protection of his land, and by so doing causes the tide, the current, or the waves to flow against the land of his neighbor, and wash it away, or cover it with water, the land-owner so causing an injury to his neighbor is not responsible in damages to the latter, as he has done no wrong, having acted in self-defense, and having a right to protect his land and his crops from inundation.
14 Wash. at 79, 44 P. 113 (quoting Edward P. Weeks, The Doctrine of Damnum Absque Injuria Considered in Its Relation to the Law of Torts 3, 4 (1879)). The same authority is later quoted in Harvey v. Northern Pacific Railway Co., 63 Wash. 669, 675, 116 P. 464 (1911). But neither case concerned protection of land from the sea. Instead, the Cass and Harvey courts were presented with overflow from rivers. The mention of seawater in these cases is obiter dictum and is, therefore, not controlling. State v. Potter, 68 Wash.App. 134, 149 n. 7, 842 P.2d 481 (1992) ("Statements in a case that do not relate to an issue before the court and are unnecessary to decide the case constitute obiter dictum, and need not be followed." (emphasis added)).
*1094 ¶ 24 Further, we have specifically characterized surface water as follows:
The chief characteristic of surface water is its inability to maintain its identity and existence as a body of water. It is thus distinguished from water flowing in its natural course or collected into and forming a definite and identifiable body, such as a lake or pond.
Halverson v. Skagit County, 139 Wash.2d 1, 15, 983 P.2d 643 (1999). Storm-driven waves in Puget Sound remain part of a definite and identifiable body of water when splashing onto waterfront property. They do not satisfy the Halverson court's definition of surface water.
¶ 25 Washington courts have neither characterized storm-driven waves as surface water nor applied the common enemy doctrine to seawater. We decline to do so here.

CONCLUSION
¶ 26 We hold that the common enemy doctrine does not apply to seawater, which does not meet our definition of surface water. We reverse the Court of Appeals decision in its entirety and remand this matter for trial on the merits of Grundy's private nuisance claim.[8]
WE CONCUR: ALEXANDER, C.J., and C. JOHNSON, BRIDGE, CHAMBERS, OWENS, JJ.
MADSEN, J., concurs in result only.
FAIRHURST, J. (concurring).
¶ 27 I agree with the result reached by the majority and the majority's analysis with respect to the common enemy doctrine. I agree with Justice Sanders' concurrence, however, with respect to why the public nuisance claim is barred.
¶ 28 I also agree with both the majority and Justice Sanders that RCW 7.48.160 does not bar Evelyne Grundy's public or private nuisance claims because the seawall, while it may have been lawful, was not expressly authorized by statute. See RCW 7.48.160.
SANDERS, J. (concurring in part, dissenting in part).
¶ 29 I concur in the majority's conclusion that the public nuisance claims should be dismissed, although I would address them in greater detail and affirm the Court of Appeals' conclusion that Evelyne Grundy cannot base a public nuisance claim on the illegality of underlying permits unless she successfully challenges the issuance of those permits under the Land Use Petition Act (LUPA), chapter 36.70C RCW.
¶ 30 A short review of Grundy's legal theories is necessary to place the majority's erroneous analysis in context.
¶ 31 Grundy makes three nuisance claims. Nuisance is a statutory cause of action in Washington. Grundy claimed a public nuisance under RCW 7.48.130 (under two separate legal theories) and a private nuisance under RCW 7.48.150. "A public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal." RCW 7.48.130. "Every nuisance not included in the definition of RCW 7.48.130 is private." RCW 7.48.150.
¶ 32 Grundy asserts heightening the seawall is a public nuisance for two reasons: (1) increasing the height of the seawall violates RCW 7.48.140(3), and (2) building the seawall without an allegedly required permit is a per se public nuisance.
¶ 33 RCW 7.48.140 is titled "[p]ublic nuisances enumerated." Grundy's First Amended Complaint (Clerk's Papers (CP) at 9) alleged increasing the height of the seawall falls within the ambit of subsection (3): "[t]o obstruct or impede, without legal authority, the passage of any river, harbor, or collection *1095 of water." (Emphasis added.) Since the Bracks' building permit constitutes "legal authority" to raise the height of the seawall, Grundy attacks the validity of the permit. She tries to do this by alleging that the building permit should not have been issued absent a shoreline substantial development permit. CP at 9-12.
¶ 34 Grundy also claims that any structure built without the proper permits is a public nuisance per se. Of course, in order to make this dubious claim,[1] Grundy must show that the structure was actually built without proper permits.
¶ 35 RCW 7.48.160 provides further impetus for Grundy to attack the Bracks' permit. It states, "[n]othing which is done or maintained under the express authority of a statute, can be deemed a nuisance." The trial court clearly considered this statute when granting summary judgment, Report of Proceedings (RP) at 5, 35 (stating that there was no nuisance because the Bracks had "valid permits"). Since this statute could arguably be interpreted to immunize any improvement to real property from being the source of a nuisance complaint if built according to a permit, the statute leads Grundy to attack Bracks' permit.[2]
¶ 36 Grundy's public nuisance action was dismissed on summary judgment because the trial court concluded Grundy's attack on the permit was barred by the LUPA since no action was filed within 21 days of issuance. It is this determination that is the subject of the majority's first error.

I. Public Nuisances and Permits
¶ 37 The majority contends the public nuisance claims are not properly before the court because Thurston County is not a party to this appeal. Majority at 1092. I agree when a public nuisance action is premised on the alleged illegality of a permit, the issuing authority may be a necessary party.[3] However, Thurston County is respondent in this action and filed an appellate brief.[4] The majority also states that "the trial court did not determine the legality of the exemption the county issued to the Bracks." Majority at 1092. The record clearly belies this statement.
*1096 ¶ 38 Grundy's failure to attack the underlying permit in a LUPA action was a central issue at oral argument on the motion for summary judgment. RP at 5, 10, 23, 29. The trial court specifically stated:
The Court will hold the following: the failure to challenge the decision of a granted permit under LUPA, under the time stated of the seawall, constitutes what I consider summary judgment and order; I specifically reject the fact the bulkhead was built pursuant to an invalid permit; and I grant summary judgment for the Bracks to continue [to] have the seawall. However, I deny summary judgment to Thurston County as to whether or not the permit is illegal.
RP at 33.
¶ 39 These statements must be viewed in light of the claims Grundy made in her first amended complaint and the circumstances of summary judgment. The County did not seek summary judgment, only the Bracks. See CP at 14;[5] RP at 15 (where the attorney for Thurston County states "We didn't provide any materials. It's not our summary judgment."). As the majority noted, Grundy only sought abatement against the Bracks. But Grundy also sought a declaration that the permit was "null and void as contrary to law" and attorney fees on the grounds of "the bad faith of the county in issuance of the permit." First Amended Complaint (CP at 12). The trial court granted the Bracks' motion for summary judgment dismissing the nuisance claims but withheld any decision regarding the illegality of the permit as to the claims against the county.[6] RP at 33, 35; CP at 94.
¶ 40 The trial court clearly dismissed the public nuisance claims on the ground that Grundy could not collaterally attack the permits absent a timely challenge under LUPA. I fail to see how the county's status in this appeal is at all relevant. The majority fails to explain how the determination that the permits should be deemed valid because their issuance was not challenged rests on whether the issuing authority is party to an appeal. I see no connection, but the county is a respondent in any event.
¶ 41 The majority continues, "Whether the county illegally issued an administrative shoreline exemption to the Bracks was not decided by the trial court, so it is not properly before us." Majority at 1093. But the reason the trial court didn't reach the illegality of the administrative shoreline exemption was because Grundy didn't challenge the exemption, or the building permit linked to the exemption, under LUPA! And Grundy's appeal rests largely on the assertion that this determination by the trial court was in error. If Grundy was right that LUPA does not foreclose her collateral attack on the legality of the permit, she would likely be entitled to relief.
¶ 42 Grundy deserves her day in court, by which I mean consideration of all the legal arguments she advances. I give her the analysis she is due.

II. Does LUPA apply?
¶ 43 Because the majority errs in its claim that Grundy's public nuisance claim is not before this court, we must determine if Grundy is foreclosed from claiming the permit is illegal because Grundy didn't challenge the permit through a LUPA action.
¶ 44 I would follow the learned Court of Appeals opinion to hold because Grundy did not challenge the permit in a LUPA action, she is foreclosed from claiming the illegality of the permit as the basis of her public nuisance claim. Such would simply be a collateral attack on the permit and would allow any party to avoid the procedural requirements of LUPA by claiming development authorized by an unchallenged permit is a "public nuisance" and later suing to abate the alleged public nuisance. By explicitly *1097 stating that LUPA is the "exclusive means of judicial review of land use decisions," RCW 36.70C.030(1), the legislature clearly did not intend for public nuisance actions premised on permit invalidity to "end run" around chapter 36.70C RCW.[7]

III. The Common Enemy Rule Bars Grundy's Private Nuisance Claim
¶ 45 The Bracks cited the need to defend against "storm-driven seawater" and "winter storms."[8] The Court of Appeals described the surface waters at issue as "`ocean surge water'"[9] and quoted our definition of surface waters from Miller v. Eastern Railway & Lumber Co.:
Surface waters that may "become vagrant and subject to outlawry are waters accumulating and spreading in consequence of heavy rains and storms."
Grundy, 116 Wash.App. at 635, 67 P.3d 500 (emphasis added) (quoting Miller v. E. Ry. & Lumber Co., 84 Wash. 31, 34-35, 146 P. 171 (1915)).
¶ 46 Citing our decision in Halverson,[10] the majority asserts that "[s]torm-driven waves in Puget Sound remain part of a definite and identifiable body of water when splashing onto waterfront property." Majority at 1094. I cannot see how storm-driven waves which overflow the normal high-water mark differ from storm-swollen river waters that overflow their banks.
¶ 47 The waters of Puget Sound within the boundaries of ordinary high tides might well not meet the definition of "surface waters" from our case law, just as the waters traveling within the banks of a defined river are not "surface waters." But just as the waters that escaped the banks of a river are surface waters,[11] Puget Sound waters driven by storms past the regular high tide marks are surface waters.
¶ 48 The majority cites the "`chief characteristic'" of surface water "`is its inability to maintain its identity and existence as a body of water.'" Majority at 1094 (quoting Halverson v. Skagit County, 139 Wash.2d 1, 15, 983 P.2d 643 (1999)). But the majority fails to distinguish between river floodwater that overflows its banks, gradually losing its "`identity and existence'" as a river while becoming pools and then evaporating altogether, and the exact same action by storm-driven waves which respond similarly as storm conditions subside.
¶ 49 In fact, all the reasons supporting the application of the common enemy rule against storm-generated flooding from rivers apply equally against storm-generated flooding from Puget Sound. It was precisely because the reasons for applying this rule are identical that the application of the common enemy rule to Puget Sound has not been questioned in the more than 100 years since this court first acknowledged that the rule applied in Cass v. Dicks, 14 Wash. 75, 44 P. 113 (1896).[12]
¶ 50 Although the majority fails to anchor its holding on the rationale underlying the common enemy rule, that rationale is set forth in Cass and is worth recalling:

*1098 The rule is based upon the principle that such water is a part of the land upon which it lies, or over which it temporarily flows, and that an owner of lands has a right to the free and unrestrained use of it, above, upon and beneath the surface.
Id. at 78, 44 P. 113.
¶ 51 This applies equally to land owners located on the banks of the Puget Sound as to those on the banks of the Skagit River.
¶ 52 I see no reason to abandon over 100 years of precedent applying the common enemy rule against storm-driven seawater in Washington.

IV. Conclusion
¶ 53 LUPA time bars the collateral attack on the legality of the shoreline exemption and building permit, an attack which Grundy must make in order to prove her public nuisance claims. Thus, I concur in the result reached by the majority as to the public nuisance claims. However, the common enemy rule has insulated property owners from liability for protecting themselves from Puget Sound storm-driven floodwaters for over 100 years, and now is no time to change.
¶ 54 I would affirm the trial court's dismissal in its entirety and dissent.
NOTES
[*] Justice Faith Ireland is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).
[1] The Bracks originally proposed to raise their existing seawall, to backfill behind it, and to add rock seaward. Thurston County determined that raising the seawall qualified for an administrative exemption from the shoreline substantial development permitting process set out in RCW 90.58.140(2), despite the position of the Department of Ecology shoreline specialist who reviewed the project:

This proposal is not exempt from shoreline permitting requirements. . . . In the case of a bulkhead, exemptions shall only be granted for the construction of the normal protective bulkhead common to single-family residences. The site plan shows a "future home" which leads me to believe that there is no home currently on the lot in close proximity to the area with the bulkhead, and thus no exemption for the proposal. The best protection for development is an adequate setback combined with the enhancement of native vegetation along the shoreline.
Clerk's Papers (CP) at 262. "The County is urged to withdraw the exemption . . ., combine the entire project under one proposal and put it through the shoreline permit process." Id. at 263, 44 P. 113.
[2] Grundy contends that seawater was not eroding the Bracks' property: "The whole purpose of Brack's [sic] raising the seawall was to create dry land for building sites in an area which had seasonally and harmlessly flooded as far back as anyone can remember, but always drained away when the storms subsided." Pet'r's Resp. to Amici Walker, et al. at 2.
[3] "The Court granted judgment for the Bracks to have the sea wall, however, the Court denied summary judgment to Thurston County as to whether or not the permit is illegal." CP at 369.
[4] Grundy brought a second cause of action against the Bracks, alleging they illegally filled the lots next to her property with contaminated soils. This cause of action was also dismissed, and it was not pursued on appeal. Grundy voluntarily nonsuited her third cause of action, which alleged illegal gating of public access, after the Bracks removed the gate that prevented vehicles from using a long established turnaround. In its order dismissing the third cause of action, the trial court stated: "This dismissal constitutes a final adjudication for purposes of appeal." CP at 385.
[5] The Court of Appeals would foreclose Grundy's public nuisance claim because "[n]othing which is done or maintained under the express authority of a statute, can be deemed a nuisance." RCW 7.48.160. But a lawful action may still be a nuisance:

When a nuisance actually exists, it is not excused by the fact that it arises from a business or erection which is of itself lawful; and, even though an act or a structure was lawful when made or erected, if for any reason it later becomes or causes a nuisance, the legitimate character of its origin does not justify its continuance as a nuisance.
66 C.J.S. Nuisances § 15, at 551-52 (1998) (footnote omitted). "[A] `fair test as to whether a business lawful in itself, or a particular use of property, constitutes a nuisance, is the reasonableness or unreasonableness of conducting the business or making the use of the property complained of in the particular locality and in the manner and under the circumstances of the case'." Powell v. Superior Portland Cement, 15 Wash.2d 14, 19, 129 P.2d 536 (1942) (quoting 46 C.J. Nuisances § 20 (1928)). "The fact a governmental authority tolerates a nuisance is not a defense if the nuisance injures adjoining property." Tiegs v. Watts, 135 Wash.2d 1, 15, 954 P.2d 877 (1998).
[6] "At oral argument, Grundy's counsel explained that she does not seek anything but the abatement of the nuisance, namely, the removal of the heightened portion of the sea wall." Grundy, 116 Wash.App. at 629 n. 5, 67 P.3d 500.
[7] The Court of Appeals neglected to address the limits on the common enemy doctrine that have been judicially created since 1896. Courts have developed exceptions to the common enemy doctrine because its strict application may be inequitable. Currens v. Sleek, 138 Wash.2d 858, 861-62, 983 P.2d 626 (1999). For example, one exception prohibits landowners from artificially channeling and discharging surface water onto their neighbors' land in quantities greater than or in a manner different from its natural flow. Id. at 862, 983 P.2d 626. In addition, the Currens court held: "[U]nder our common enemy jurisprudence, landowners who alter the flow of surface water on their property must exercise their rights with due care by acting in good faith and by avoiding unnecessary damage to the property of others." Id. at 865, 983 P.2d 626.
[8] Geologist J.W. Johannessen stated: "After the bulkhead at the point was raised, waves that may be present at the time of very high water events would force marine water onto the Grundy yard at the time of overtopping. It therefore appears that the raising of the bulkhead at the point has acted to increase the amount of coastal flooding at the Grundy property." CP 273. This unrebutted expert testimony, along with Grundy's declaration, creates an issue of material fact as to whether the Bracks' raised seawall substantially and unreasonably interferes with Grundy's use and enjoyment of her property.
[1] Grundy has cited two cases to support this claim, Kitsap County v. Kev, Inc., 106 Wash.2d 135, 720 P.2d 818 (1986), and State v. Boren, 42 Wash.2d 155, 253 P.2d 939 (1953). But neither of these cases is on point. Neither dealt with the construction of an improvement to real property without allegedly necessary permits. Both dealt with engaging in a regulated business or profession "in defiance of a law regulating or prohibiting the same." Kev, Inc., 106 Wash.2d at 138, 720 P.2d 818. In Kev, Inc., the business was a strip parlor which violated numerous regulatory and criminal laws. In Boren the per se public nuisance was practicing dentistry without a license. Similarly, in every case in which the term "nuisance per se" has been used by this court, the term has been applied to the operation of a business. Grundy has not provided any rationale for extending such an action to improvements to real property built without proper permits, let alone improvements to real property built under permits that were alleged to have been erroneously issued by the government.
[2] I am not convinced that this statute immunizes a property owner who obtains required government permits from a nuisance action. The statute was originally drafted in 1875 by the Territorial Legislative Assembly and has not been amended since. Second, when this statute was drafted there was no requirement to get any kind of permit to improve real property. There was no requirement to obtain a building permit, let alone any of the vast array of so-called "environmental" permits now issued by state and local governments. Therefore it is very unlikely that the drafters of this statute had in mind what we now call "permits" when they used the phrase "done or maintained under the express authority of a statute." Further, our past cases have not treated this statute as a bar to analysis of potential liability for a private nuisance. See Bruskland v. Oak Theater, Inc., 42 Wash.2d 346, 350-51, 254 P.2d 1035 (1953).

However, the issue of the meaning of this statute is not central to this dissent, since I would affirm the Court of Appeals' determination that failure to appeal the building permit under LUPA forecloses the public nuisance actions and that the common enemy doctrine immunizes the Bracks from the private nuisance claim.
[3] "A necessary party is one which has sufficient interest in the litigation that the judgment cannot be determined without affecting that interest or leaving it unresolved." Harvey v. Bd. of County Comm'rs of San Juan County, 90 Wash.2d 473, 474, 584 P.2d 391 (1978) (citing Civil Rule 19(a)).
[4] Br. of Resp't Thurston County filed in the Court of Appeals, Division Two, No. 26347-5-II.
[5] The Bracks' motion for summary judgment further demonstrates the centrality of the LUPA argument, since it constitutes the centerpiece of the motion. CP at 17-20.
[6] Admittedly, those "claims" were ill-pleaded, perhaps not even sufficient to meet the liberal standards of CR 8, particularly if Grundy actually sought a declaratory judgment against the county regarding the permit. However, the county did not raise that, and the trial court reserved such issues, along with all "claims" against the county, for another day.
[7] Grundy also alleges that if LUPA were applied to bar her claim, her constitutional right to due process of law under the fourteenth amendment to the United States Constitution would be violated. I simply note that the Fourteenth Amendment applies only to government action that deprives one of "life, liberty, or property." Grundy has certainly not demonstrated a liberty or property interest in her neighbor's receipt of a permit.

LUPA does not apply to claims for monetary damages or compensation, RCW 36.70C.030(1)(c), but this action is for abatement, not damages or compensation.
[8] See Answer to Resp't's Pet. for Review at 8; Court of Appeals Resp. Br. of Brack Resp'ts at 6; and Resp. to Amicus Br. of Wash. Environmental Council at 8 ("The common enemy rule permits a land owner to protect his or her property from damage when some unusual event, such as a winter storm, drives vagrant seawater past the line of ordinary high tide." (emphasis added)).
[9] Grundy v. Brack Family Trust, 116 Wash.App. 625, 635, 67 P.3d 500 (2003).
[10] Halverson v. Skagit County, 139 Wash.2d 1, 14-15, 983 P.2d 643 (1999).
[11] Halverson, 139 Wash.2d at 14-15, 983 P.2d 643.
[12] In fact, the common enemy rule has its roots in protection from encroachment of the sea. See discussion of The King v. Commissioners of Sewers of Pagham, (1828) 108 Eng. Rep. Full Reprint 1075 (K.B.), as discussed in Miller v. Letzerich, 121 Tex. 248, 49 S.W.2d 404, 410 (1932).