# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHARLES WOLFE, a single person, and JANICE WOLFE, a single person, and JOHN and DEE ANTTONEN, and the marital community comprised thereof, | ) ) ) ) ) ) | No. 77741-6-I |
| Appellants, | ) ) | |
| v. | ) ) | DIVISION ONE |
| STATE OF WASHINGTON, DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | UNPUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: June 18, 2018 |

MANN, A.C.J. — Appellants Charles and Janice Wolfe and John and Dee Anttonen (collectively Wolfe) own property downstream of the Naselle River Bridge in Pacific County. Wolfe sued the Washington State Department of Transportation (WSDOT) in 2014, alleging that the bridge was a public nuisance. The case proceeded to a bench trial. After Wolfe rested, the trial court granted WSDOT's motion for involuntary dismissal. Wolfe appeals the trial court's findings, conclusions, and order of dismissal.

Because substantial evidence supports the trial court's findings, and those findings support its conclusions of law, we affirm.

## FACTS

In 1926, WSDOT commissioned the construction of a bridge to accommodate a state highway, now known as SR 4.[1] The bridge was designed to span the Naselle River, approximately 200 feet. In order to elevate the roadway to accommodate this span, a 600-foot earth-fill embankment (approach embankment) was built on the northwesterly bank of the river. The bridge was replaced in 1985. The 1985 bridge was widened to 36 feet, and raised 6 feet to obtain flood clearance; the approach embankment was also raised 6 feet. Like the 1926 bridge, the 1985 bridge spanned approximately 200 feet, which cleared the channel of the Naselle River flowing underneath. One of the bridge piers was repaired in 1998. This repair included installing a riprap adjacent to one of the bridge piers to protect it from river scour.[2]

In 2004, Charles and Janice Wolfe purchased a nearby parcel of real property downstream of the bridge (Wolfe property). The Wolfes then purchased a neighboring parcel that abuts the Wolfe property to the east. In 2007, the Wolfes conveyed the second property to John and Dee Anttonen (Anttonen property). Both properties experience recurring flooding and bank erosion that the parties maintain was caused by the bridge, particularly the realignment of the bridge piers in 1985 that redirected the river toward their properties.

---

[1] Both parties substantially rely on the trial court's findings of fact in their "Statement of the Case." The majority of the trial court's findings of fact are unchallenged, and unchallenged findings of fact are verities on appeal. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). Wolfe does assign error to findings of fact, 1.31-1.34, 1.36, 1.40-1.46.

[2] Riprap is "a foundation or sustaining wall of stones thrown together without order (as in deep water on a soft bottom, or on an embankment to prevent erosion)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1960 (2002).

In 2010, Wolfe sued WSDOT in Pacific County Superior Court alleging inverse condemnation, negligence, and nuisance (Wolfe I). Wolfe I was dismissed by the superior court. The dismissal was affirmed by Wolfe v. Dep't of Transp., 173 Wn. App. 302, 293 P.3d 1244 (2013).

In 2014, Wolfe again sued WSDOT in Thurston County Superior Court (Wolfe II), alleging the bridge was a public nuisance and seeking an abatement of the nuisance. The trial court denied WSDOT's motion for summary judgment, finding that a floodplain obstruction claim was actionable under Washington's public nuisance laws. To avoid the doctrine of res judicata, however, Wolfe's public nuisance claims were limited to (1) an "obstruction" claim under RCW 7.48.140(3), and (2) a "pollution" claim under RCW 7.48.140(2).

Wolfe II proceeded as a bench trial. Wolfe called four witnesses, plaintiff Colonel John Anttonen, expert Russ Lawrence, plaintiff Charles Wolfe, and expert Kimberly Schaumburg.

Anttonen testified to the flooding and erosion he had seen on his property. Anttonen described how he had looked at the FEMA floodplain map before deciding where to build his house, but noticed that more areas had been flooding than were designated by the floodplain. Anttonen also testified that the area of his property included in the FEMA floodplain maps had increased, thereby reducing the value of his property. Anttonen explained that he had reached out to agencies and experts to determine the cause of the erosion on his property. In response, WSDOT inspected the property and WSDOT engineer Jim Park prepared a report (Park report). The Park report concluded the erosion was caused by natural river meander. Anttonen then hired

Pacific Water Resources to review the Park report. Pacific Water Resources believed that the erosion was being driven by the way the bridge was built. Finally, Anttonen testified that he fished in the area and regularly witnessed other people fishing in the area.

Russ Lawrence, a fluvial geomorphologist, testified as an expert witness. Lawrence opined that the bridge and its approach embankment are obstructing the Naselle River. Lawrence based his testimony on his 2011 examination of the Wolfe property.[3] Lawrence testified that the placement of the fill in the 600-foot area within the floodway constricted the natural course of the river and interfered with the natural meandering of the river. Lawrence also testified that the piers for the 1985 bridge were rotated 15-degrees south, changing the water flow and increasing the velocity in the direction of the plaintiff's property. This, he explained, subsequently caused increased erosion below the bridge and caused the flow of the river to change. Finding of Fact (Finding) 1.23.[4] Lawrence testified he "would expect" the change in pier orientation would cause "the flood levels above the bridge to be incrementally reduced and below the bridge to be incrementally increased." Lawrence did not, however, testify that flooding had actually increased downstream of the bridge or that the bridge was the cause of increased flooding downstream.[5]

---

[3] Lawrence summarized his findings in a report entitled, "Geomorphic Evaluation of the Impacts of the SR 4 Bridge Across the Naselle River, SR 4 milepost 6.06." Lawrence's testimony was veritably a reiteration of this report.

[4] In Wolfe's opening brief, Wolfe states "Findings of Fact 1.26 through 1.30 (CP 1507)" correctly capture his expert testimony.

[5] See Unchallenged Finding 1.31: "The Wolfe and Anttonen properties have experienced inundation by floodwater during flooding events. However, the court does not find sufficient evidence to establish that the bridge or earth fill approach was the cause of the increased flooding events."

Lawrence reluctantly agreed there are other banks along the Naselle River that are eroding, unrelated to the bank on the Wolfe and Anttonen properties. Lawrence also agreed that the erosion has been occurring "throughout the system" at a higher rate due to a greater frequency of high flow events. Although Lawrence opined that it was worse near the bridge, Lawrence did not state what other areas of the river he had examined to support this statement.[6] Finally, Lawrence stated that the earth fill approach does not obstruct the flow of the river below the "ordinary high water mark," and that "the bridge, as it currently exists, is wide enough to pass a 'bankfull' event without upstream or downstream impacts."[7] Findings 1.23-1.24. According to Lawrence, his conclusion was "that the reorientation of the piers supporting the bridge did not ameliorate the floodplain construction and increased downstream erosion."

After Lawrence's testimony, WSDOT sought leave to call their witness, Steven Zaske, out of order to accommodate Zaske's schedule. Wolfe initially stipulated to this request until WSDOT qualified that they did not waive any defense or assume any burden of proof. Wolfe then objected. The trial court noted the objection, but allowed WSDOT to call Zaske out of order. Zaske testified that he worked for WSDOT and had prepared an environmental checklist and issued a determination of non-significance for

---

[6] The State questioned whether Lawrence reviewed the Pacific Water Resources report, Exhibit 80, which concluded the frequency of high flow events have increased over time. Lawrence stated he did not.

[7] "Bankfull" and "ordinary high water" were used interchangeably throughout the testimony, although they have slightly different definitions. 'Ordinary high water mark' is "that mark that will be found by examining the bed and banks and ascertaining where the presence and action of waters are so common and usual, and so long continued in all ordinary years, as to mark upon the soil a character distinct from that of the abutting upland." RCW 90.58.030. A "Bank" is any land surface that is "landward of the ordinary high water line next to a body of water and constrains the water except during floods." WAC 220-660-030. "'Bankfull depth' means "the average vertical distance between the channel bed and the estimated water surface elevation required to completely fill the channel to a point above which water would enter the flood plain or intersect a terrace or hillslope." WAC 222-16-010.

-5-

compliance with the State Environmental Policy Act, chapter 43.21C RCW (SEPA). Zaske testified to his knowledge of the bridge's reconstruction project in 1985, including the environmental compliance measures WSDOT performed as part of the project.

Charles Wolfe then testified to the increased flooding on his property and the erosion that has occurred since he purchased it. Wolfe described the research he performed investigating the cause of the erosion, and how he determined the best way to protect his property from further erosion. Wolfe eventually concluded that the bridge was the cause of the erosion and reached out to WSDOT, resulting in the Park report. Wolfe then described his efforts to acquire proof that WSDOT had obtained the correct permits when the bridge was built. Wolfe was not offered as an expert witness and was not permitted to analyze the causes of the flooding or the data related to the flooding.

On the third day of trial, while Charles Wolfe was still testifying, Wolfe moved for leave to recall Anttonen to clarify and expand on some of his previous testimony. The trial court granted that motion. Later that day, Wolfe moved for leave to recall Lawrence arguing that he could rebut Zaske's testimony and to discuss the bridge's effect on the floodplain. After hearing argument from both sides, the trial court denied Wolfe's motion to recall Lawrence.

Kimberly Schaumburg, a biologist, then testified as an expert witness. Schaumberg testified to her observations of the property and the types of pollution that often occurs due to erosion. Schaumburg testified that scour is erosion from the water to the stream bank or bed and has numerous negative impacts to aquatic life. Schaumburg testified that she did not perform an independent assessment of the water quality and did not take water samples. Schaumburg instead relied on water quality

sampling collected by the Washington Department of Ecology (DOE) upstream of the bridge. DOE's data showed water quality concerns for temperature, dissolved oxygen, and ammonia. Schaumberg did not testify that DOE's data indicated concerns about sediment or turbidity.

After Wolfe rested, WSDOT moved for involuntary dismissal. The trial court granted the motion and issued an extensive oral ruling. The trial court rejected WSDOT's legal claims, but concluded, "the evidence that has been presented by the Plaintiffs is not sufficient to carry the burden of proof that the Plaintiffs have and to establish the elements of a public nuisance." The trial court held, "I have given great thought to all of the evidence, and ultimately, I am finding that the evidence simply does not make all of the connections and does not support all of the elements that must be shown for a public nuisance." The trial court then entered extensive written findings of fact and conclusions of law, and dismissed Wolfe's public nuisance claims. This appeal followed.

## ANALYSIS

### *Standard of Review*

Under CR 41(b)(3), "[a]fter the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." The trial court may grant the motion as a matter of law or fact. Roy v. Goerz, 26 Wn. App. 807, 809, 614 P.2d 1308 (1980), overruled on other grounds by Chaplin v. Sanders, 100 Wn.2d 853, 859, 676 P.2d 431 (1984).

If the trial court rules as a matter of law, "'it must treat the plaintiff's evidence as true and determine that the plaintiff has failed to establish a prima facie case.'" Logan v. Logan, 36 Wn. App. 411, 415, 675 P.2d 1242 (1984) (quoting N. Fiorito Co. v. State, 69 Wn.2d 616, 618, 419 P.2d 586 (1966)). If the trial court rules as a matter of fact, it may "weigh the evidence in support of plaintiff's case and make 'a factual determination that plaintiff has failed to establish a prima facie case by credible evidence, or that the credible evidence establishes facts which preclude plaintiff's recovery.'" Logan, 36 Wn. App. at 415 (quoting N. Fiorito, 69 Wn.2d at 618); Dependency of Schermer, 161 Wn.2d 927, 939, 169 P.3d 452 (2007). In weighing the evidence, "the trial court, as the trier of the facts, is not required to accept all of plaintiff's evidence as true." N. Fiorito, 69 Wn.2d at 618-19. The trial court is to "appraise the credibility of the testimony and the force of any exhibits, and may believe or disbelieve plaintiff's evidence, resolve testimonial conflicts, evaluate circumstantial evidence, [and] draw reasonable and allowable inferences." N. Fiorito, 69 Wn.2d at 618-19.

When the trial court enters a judgment on the merits, it must make findings of fact. Schermer, 161 Wn.2d at 939; CR 41(b)(3). There is a strong suggestion that the trial court has weighed evidence when it enters findings of fact and conclusions of law. Schermer, 161 Wn.2d at 940.

In this case, the trial court entered judgment on the merits after entering extensive findings of fact and conclusions of law.[8] Therefore, "appellate review is limited to whether substantial evidence supports the trial court's findings and whether

---

[8] Wolfe incorrectly argues that the trial court ruled as a matter of law because the dismissal turned on "incorrect legal views." In the trial court's oral ruling, the trial court explicitly rejected the State's legal arguments and instead weighed the factual evidence against the legal standard, resolving the case on its merits. We find no support for Wolfe's contention that the trial court ruled as a matter of law.

the findings support its conclusions of law." Schermer, 161 Wn.2d at 940 (citing Nelson Constr. Co. of Ferndale v. Port of Bremerton, 20 Wn. App. 321, 582 P.2d 511 (1978). Substantial evidence is the quantum of evidence "sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

### Public Nuisance

Wolfe's claims arise out of Washington's public nuisance statute, chapter 7.48 RCW. A nuisance is broadly defined as "unlawfully doing an act, or omitting to perform a duty, which act or omission either annoys, injures or endangers the comfort, repose, health or safety of others . . . or in any way renders other persons insecure in life, or in the use of property." RCW 7.48.120; Grundy v. Thurston County, 155 Wn.2d 1, 6-7, 117 P.3d 1089 (2005). An actionable nuisance includes "an obstruction to the free use of property, so as to essentially interfere with the comfortable enjoyment of the life and property." RCW 7.48.010. Any person whose property is injuriously affected or whose personal enjoyment is lessened by a nuisance may sue for damages and for injunctive relief to abate the nuisance. RCW 7.48.020; Grundy, 155 Wn.2d at 6-7.[9]

A nuisance "which affects equally the rights of an entire community or neighborhood" is a public nuisance." RCW 7.48.130. RCW 7.48.140 lists several enumerated public nuisances, including, as pertinent here, "(2) . . . to corrupt or render unwholesome or impure the water of any such spring, stream, pond, lake, or well, to the

---

[9] "Every person who has the care, government, management, or control of any building, structure, . . . shall, for the purposes of this section, be taken and deemed to be the owner or agent of the owner or owners of such building, structure, . . . and, as such, may be proceeded against for erecting, contriving, causing, continuing, or maintaining such nuisance." RCW 7.48.140(9). Nobody contests that WSDOT has control over the bridge.

injury or prejudice of others; [and] (3) To obstruct or impede, without legal authority, the passage of any river, harbor, or collection of water." RCW 7.48.140(2)-(3). "A private person may maintain a civil action for a public nuisance, if it is specifically injurious to himself." RCW 7.48.210; Hostetler v. Ward, 41 Wn. App. 343, 356-57, 704 P.2d 1193 (1985). Wolfe argues that the bridge is a public nuisance under both RCW 7.48.130 (2) and (3).

A. Obstruction

Wolfe argues first that the bridge is a public nuisance because it obstructs "without legal authority, the passage of any river, harbor, or collection of water." RCW 7.48.140(3). Wolfe maintains the bridge obstructs the Naselle River floodplain, which negatively impacts the river's natural migration process causing increased flooding to the Wolfe property and the community below the river.

The trial court's findings of fact affirmed Wolfe's claims that the earth fill and the bridge constituted an obstruction of the floodplain. Finding 1.26. The trial court also agreed that the obstruction "resulted in a change of water flow, as well as increased river velocities in the vicinity of the bridge," and the "600-foot long earth fill approach across the floodplain has constrained and interfered with the natural meandering characteristics of the river." Findings 1.26-1.28. The court also found that the Wolfe and Anttonen properties "have experienced inundation by floodwater during flooding events." Finding 1.31. Neither party contests these findings.

Nevertheless, the trial court found the evidence was insufficient "to establish that the bridge or the earth fill approach was the cause of the increased flooding events." Finding 1.31. The court found also that the evidence was insufficient "to establish that

the bridge or the earth fill approach was the cause of any change in the floodplain designation on FEMA Flood Insurance Rate Manual (FIRM) maps of the area." Finding 1.32. Thus, without evidence to demonstrate a "causal link" between the bridge and the increased flooding, the trial court concluded "[t]he evidence is insufficient to prove that the bridge and the earth fill approach are the cause of flooding on plaintiffs' land or of any change in the area's FEMA FIRM maps." Conclusion of Law (Conclusion) 2.9.

After reviewing the record, we agree with the trial court that Wolfe failed to demonstrate that the bridge was the cause of the flooding. While Lawrence speculated that he "would expect" the bridge to result in increased flooding downstream, he offered no evidence or opinion that the bridge was the actual cause of any downstream flooding and instead agreed that there had been increased flooding events throughout the river. Wolfe's argument relies simply on evidence that flooding was occurring. Wolfe does not identify evidence in the record that demonstrates the cause of this flooding. Wolfe's argument instead relies on mere speculation, arguing the "reasonable inference from evidence in the record" is that "the cause of the increase in base flood elevation is the SR4 Bridge."

Wolfe maintains "WSDOT had the burden of proving the affirmative defense" that the bridge was not the cause of the flooding. Wolfe is incorrect. Wolfe, as the plaintiff, carried the burden of demonstrating that the bridge was an "obstruction" that constituted a "nuisance." "An actionable nuisance must injure the property or unreasonably interfere with enjoyment of the property." Tiegs v. Watts, 135 Wn.2d 1, 13, 954 P.2d 877 (1998). Thus, for Wolfe to meet his burden, he needed to provide sufficient evidence that the bridge and fill obstructed the river, and that obstruction caused the

changes to the rivers floodplain that injured his property. The State did not have the burden to "justify the impacts of the SR4 Bridge," because Wolfe failed to meet his burden of proving that the bridge was causing those impacts. We hold the trial court's conclusion that Wolfe failed to prove that the bridge and the earth fill approach are the cause of flooding on Wolfe's property is supported by the court's findings and substantial evidence. Conclusion 2.9.[10]

Wolfe also argues the trial court committed legal error when it erroneously required proof that the increased flooding exceeded a certain percentage when the law prohibits any increase in base flood elevation. This is incorrect. The trial court explicitly found there was no evidence that the bridge had caused any increase in flooding. The trial court only mentioned whether the flooding had "create[d] an impact in the base flow elevation by more than one foot" while discussing whether the construction of the bridge was lawful, not in determining causation. The trial court did not misapply the law.

We turn next to Wolfe's argument that the bridge is a public nuisance because, due to its obstruction, it is causing erosion. There is no dispute that the banks of the Wolfe and Anttonen properties are eroding. The trial court concluded that "[t]he bridge and the earth fill approach are obstructing the Naselle River's floodplain, causing erosion of plaintiffs' property and interfering with their quiet enjoyment of their land." Conclusion 2.8.

_____

[10] WSDOT briefly argues in their response that the statutory language "to obstruct or impede . . . the passage of any river, harbor, or collection of water," does not apply when the obstruction is not interfering with the ability to travel by way of the river. This corresponds with WSDOT's motion for summary judgment that was denied by the trial court. WSDOT does not assign error to the trial court's ruling that obstruction of the river includes an obstruction that alters the floodplain. "If a respondent is also seeking review, the brief of respondent must state the assignments of error and the issues pertaining to those assignments of error presented for review by respondent and include argument of those issues." RAP 10.3(8)(b). As this issue was not properly raised on appeal, we decline to consider it.

The trial court's analysis next considered whether the erosion amounted to a public nuisance. A public nuisance must affect "an entire community or neighborhood." RCW 7.48.130. The trial court found, "in light of this testimony and the reasonable inferences drawn therefrom" the evidence was insufficient "to show that erosion or bank loss extended to the entire community or a broader neighborhood than the Plaintiffs." Finding 1.40. After reviewing the record, we agree with the trial court.

Wolfe's expert, Lawrence, opined that the bridge was causing increased erosion. Lawrence's testimony, however, was limited to the effect the bridge had on the Wolfe and Anttonen properties. While Lawrence speculated that continued erosion might result in the Naselle River jumping its bank and connecting with Salmon Creek within five years, the bank and portions of Salmon Creek that are at risk of this avulsion are entirely within the Anttonen and Wolfe properties. Wolfe failed to present evidence or testimony that the erosion would affect other properties in the community. We hold the trial court's findings are supported by substantial evidence and support the conclusion that the evidence was insufficient to demonstrate that the erosion was impacting the community.

Moreover, even if Wolfe had demonstrated that the bridge resulted in increased flooding or erosion affecting the community, he also needed to demonstrate that the obstruction existed "without legal authority." RCW 7.48.140(3). Wolfe argued that WSDOT did not have the legal authority to obstruct or impede the river because there was no evidence that WSDOT received the proper permits.[11] The trial court

---

[11] Wolfe argues that the bridge is a nuisance "per se" because he proved it is "obstructing" the river. "A nuisance per se is an activity that is not permissible under any circumstances, such as an activity forbidden by statute or ordinance." Kitsap County v. Kitsap Rifle & Revolver Club, 184 Wn. App.

acknowledged this argument, but found, "sufficient evidence was not provided to establish that as a matter of fact WSDOT violated a permitting requirement at the time the bridge was replaced in 1985, or that the bridge or its approach caused a change in the base flood elevation."

The trial court's findings are supported by substantial evidence. Wolfe did not offer testimony or evidence from experts or other persons familiar with the permitting requirements to substantiate the claim that WSDOT needed to obtain additional permits in 1985.[12] The only evidence of the permits required in 1985 was a list of permits identified in the SEPA environmental checklist prepared by WSDOT. All of the permits noted in the environmental checklist were offered and admitted as exhibits.[13] Other than the permits identified in the environmental checklist, Wolfe failed to offer any credible evidence as to which permits were required at the time the bridge was built, or that WSDOT violated any permit procedures. Wolfe simply testified to what he believed to be the permits that were required at the time the bridge was built. Citing to statutes alone does not specify what permits were required administratively at the time.

---

252, 277, 337 P.3d 328 (2014), amended on denial of reconsideration (Feb. 10, 2015). A bridge is permissible under many circumstances; therefore, the bridge would only be a nuisance if it was built in violation of a statutory prohibition and without agency approval.

[12] Wolfe also argues that WSDOT did not have the correct permits for the original bridge or the 1998 repair work, however, this information is irrelevant. The original bridge was an obstruction; however, Wolfe did not present any evidence that it "interfered with the comfortable enjoyment" of his property. Wolfe similarly did not present any evidence that the repair work done in 1998 affected his property. Wolfe only provided evidence that the bridge, as built in 1985, caused the erosion and the flooding that they have experienced. Therefore, the issue is whether the bridge, as built in 1985, was an unlawful obstruction.

[13] See Exs. 169 and 20 (Application for Pacific County Shoreline Management Permit); Ex. 170 (Shoreline Management Permit from Department of Ecology); Exs.172 and 24 (Hydraulic Project Approval from Department of Fisheries); Ex. 164 (SEPA Declaration of Non-Significance, application); 165 (Environmental checklist); Ex. 167 (SEPA Final).

The trial court's findings support the conclusion that Wolfe failed to present the necessary evidence to demonstrate a prima facie case for public nuisance under RCW 7.48.140(3).

B. Erosion as Pollution

Wolfe argues next that the bridge is a public nuisance under RCW 7.48.140(2), which provides, "[i]t is a public nuisance . . . to corrupt or render unwholesome or impure the water of any such spring, stream, pond, lake, or well, to the injury of others." Wolfe maintains that the bridge is causing erosion which in turn results in excessive amounts of sediment being deposited into the river negatively affecting the river's water quality and habitability for aquatic life.

The trial court summarized the requirement for demonstrating a public nuisance under RCW 7.48.140(2) stating, "there needs to be evidence of pollution being introduced into a river that renders the river impure and that causes injury to people." Finding 1.42. The trial court found that Wolfe presented, through Shaumberg's testimony, some evidence of the potential for "water pollution." Finding 1.43. In analyzing this evidence, however, the trial court found Schaumburg "did not take specific measurements of the water quality in the area. And, while she described potential impacts to water quality in general terms, she did not offer an opinion that the bridge or the earth fill approach caused the water quality issues she noted." Finding 1.44. The trial court found that "[s]ufficient evidence has not been offered to support a finding that the bridge or the earth fill approach caused any negative impact to the river's water quality or impacts to fish or other aquatic life." Finding 1.45.

The trial court's findings are supported by substantial evidence. There is no dispute that the trial court found the bridge caused the erosion on the Wolfe and Anttonen properties. The trial court also recognized that sedimentation fouls the waters of the state and damages fish habitat. However, Schaumberg failed to present evidence that the erosion had "corrupt[ed] or render[ed] unwholesome or impure" the river "to the injury of others." RCW 7.48.140(2). Schaumberg relied entirely on water quality measurements taken by the DOE upstream of the bridge, which simply indicated concerns for temperature, dissolved oxygen, and ammonia. Schaumburg only testified to the possible effects of increased sedimentation in the water, without offering any evidence of an increase in sedimentation below the bridge.

The trial court also found "sufficient evidence [had] not been offered to establish that the entire community has been injured by any water quality change attributable to the bridge. This finding is also supported by substantial evidence.

The area near the bridge supports fishing and recreation by members of the general public. Plaintiff John Anttonen testified that this fishing continues, and that he has fished the river near his property in the past. Finding 1.46. Schaumberg did not testify that the alleged pollution had any effect on the communities continued use of the river. Wolfe simply argues "[t]he people of the state have a vested interest in clean water, unobstructed floodplains, robust aquatic habitat, and robust floodplain functions and values, consistent with RCW 90.58.020" and "a violation of these laws which threaten (or damage) public waters and public resources affect the entire community without regard to the location of the environmental perturbation." However, this is not a

concrete measure of injury.[14] Even if general statements of possible pollution were sufficient to prove a nuisance, Wolfe did not provide any evidence that he had been "specially" harmed by this pollution.

The findings support the trial court's conclusion that the evidence was insufficient to prove that the bridge or the earth fill approach were "corrupting or rendering unwholesome or impure the water of the Naselle River." Conclusions 2.17-2.18. We hold the findings support the trial courts conclusion that Wolfe failed to demonstrate a prima facie case for public nuisance under RCW 7.48.140(3).

*Procedural Issues*

Wolfe next raises three procedural issue on appeal.

Wolfe contends first that the trial court abused its discretion when it permitted the State's witness, Zaske, to be called during their presentation of the case. We disagree.

It is undisputed that the plaintiff bears the burden of proof at trial, and is entitled to present its case first. Allowing the plaintiff to completely present its case without interruption is generally the preferred method of procedure, however, "a trial court has discretion to permit the interruption of a party's case when necessary for the convenience of litigants or the trial court." Wilson v. Overlake Hosp. Medical Center, 77 Wn. App. 909, 913, 895 P.2d 16 (1995). Here, the State's witness was only available at this time. The trial court did not abuse its discretion in granting this limited interruption.

---

[14] Compare to Miotke v. City of Spokane, 101 Wn.2d 307, 319, 678 P.2d 803 (1984), abrogated by Blue Sky Advocates v. State, 107 Wn.2d 112, 727 P.2d 644 (1986), where the city had allowed a bypass that permitted untreated sewage to enter the lake.

Wolfe argues next that permitting Zaske to testify barred the State from subsequently filing a motion for involuntary dismissal under CR 41(b)(3).[15] Again, we disagree.

A defendant generally waives a challenge to the sufficiency of the evidence by proceeding to present evidence after his motion to dismiss has been denied, or where the court "fails to rule or reserves its ruling." Hector v. Martin, 51 Wn.2d 707, 709, 321 P.2d 555 (1958); NW. Wholesale v. Pac Organic Fruit, 184 Wn.2d 176, 182-183, 357 P.3d 650 (2015), cert. denied, 136 S. Ct. 1453, 194 L. Ed. 2d 551 (2016). "This rule simply means a defendant waives the right to challenge the sufficiency of the plaintiff's evidence alone by presenting evidence in defense," it does not bar the court from considering "the motion in light of all of the evidence." See NW. Wholesale, 184 Wn.2d at 182-83.

In NW. Wholesale, the plaintiff challenged the decision of the trial court granting the defendant's motion for dismissal after the defendant presented evidence. The appellate court held "even if sufficiency of the evidence bore on any pertinent question, nothing indicates that the trial court limited itself to considering only [the plaintiff's] evidence." 184 Wn.2d at 183. Thus, the prejudice occurs when the plaintiff does not

---

[15] CR 41(b)(3) states:
After the plaintiff, in an action tried by the court without a jury, has completed the presentation of the evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in rule 52(a). Unless the court in its order for dismissal otherwise specifies, a dismissal under this subsection and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under rule 19, operates as an adjudication upon the merits.

receive the benefit of all of the evidence presented, not that the defendant's evidence prejudiced the plaintiff.

In this case, the trial court specifically stated that it had considered Zaske's testimony when ruling on the motion. Therefore, both parties were given the benefit of all of the evidence. Wolfe also frequently uses Zaske's testimony in his favor throughout his brief. Hector and NW Wholesale indicate that the remedy for a potential error is that we are also to view all of the evidence on appeal, which we have done.

Finally, Wolfe argues that the trial court erred in denying his request to recall Lawrence "as a rebuttal expert." We disagree. "The recalling of a witness prior to the close of a party's case is a matter for the discretion of the trial court, and will not be reversed absent a manifest abuse of discretion." State v. Martinez, 53 Wn. App. 709, 717, 770 P.2d 646 (1989). We also review the refusal by a trial court to admit rebuttal evidence under a manifest abuse of discretion standard. State v. White, 74 Wn.2d 386, 395, 444 P.2d 661 (1968). Such abuse occurs only when no reasonable person would take the adopted view. Discipline of Van Camp, 171 Wn.2d 781, 799, 257 P.3d 599 (2011). A trial court is responsible for controlling the mode and order of witnesses and presentation of evidence pursuant to ER 611.

At trial, Wolfe moved for leave to recall Lawrence for the purpose of testifying to new issues that he did not address previously, to clarify his prior testimony, and to rebut the discussion of the permits that have been identified by Zaske's testimony. On appeal, Wolfe argues that recalling Lawrence was necessary to rebut Zaske's testimony regarding the need for a no-rise certificate or other applications considering flood levels.

-19-

Rebuttal evidence is admitted to enable the plaintiff to answer new matters presented by the defense. White, 74 Wn.2d at 394. In this case, Lawrence's testimony would not have responded to new matters raised by Zaske. One of the arguments Wolfe raised at trial was that WSDOT failed to obtain the necessary permits at the time the bridge was built. In doing so, Wolfe provided copies of all the permits WSDOT had obtained, including the SEPA environmental checklist. Zaske's testimony simply reiterated the information available on the SEPA environmental checklist. Zaske did not offer new testimony regarding a "no-rise certification," or whether they submitted any applications considering the floodwaters, or flood rise.[16] These topics were raised, objected to, and then never pursued. Contrary to Wolfe's assertion, Zaske did not offer new evidence that needed to be rebutted.

Moreover, Wolfe failed to lay a foundation that Lawrence was qualified to testify to the permitting requirements in place at the time the bridge was built. Although Lawrence was an engineer, Wolfe offered no evidence that Lawrence was familiar with permitting requirements in 1985. The trial court also noted that Wolfe had been granted significant time to examine Lawrence, and had two years to prepare for trial. The trial court did not abuse its discretion.

---

[16] "Do you know what an engineering no rise certificate is? MR. HUOT: Objection. Exceeds the scope. THE COURT: Over -- MR. REYNOLDS: Let me ask it a different way, Your Honor. See Report of Proceedings (Oct. 11, 2016) at 295.

We affirm.

_____ Mann, A.C.J.

WE CONCUR:

_____ Trickey, J

_____